LEONARD M. SALTER, trustee in bankruptcy, *vs.* HAROLD A. LEVENTHAL & another.

Suffolk. March 3, 1958. — June 10, 1958.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Mortgage,* Of personal property: foreclosure, default, waiver of breach. *Waiver. Practice, Civil,* Exceptions: whether error harmful, saving of exception; Charge to jury; Auditor: findings; Argument to jury; Mistrial; Requests, rulings and instructions; New trial; Judgment ordered by Supreme Judicial Court. *Error,* Whether error harmful. *Evidence,* Of value, Judicial discretion, Exhibit, Auditor's report. *Damages,* For tort.

At the trial of an action against the mortgagee under a chattel mortgage securing a note payable in instalments for a wrongful foreclosure sale by the defendant at a time when allegedly there was no default, it was error for the judge to charge that if the defendant, after default on an instalment, agreed to apply money then paid to him to such instalment and to instalments to come due he thereby waived all breaches of mortgage conditions then known to him, where it appeared that, even if the defendant waived the default on the instalment due as a breach of the mortgage and relinquished an option given him by the mortgage to accelerate the maturity of the entire unpaid balance, other breaches existed and the mortgage provided that all remedies should be cumulative and that upon any default the defendant might sell the mortgaged property and retain from the proceeds of sale "all sums then secured by this mortgage, whether then or thereafter payable"; in the circumstances it was for the jury to determine whether acceptance of the money by the defendant was a waiver of all breaches by him. [686–688]

In an action for wrongful foreclosure of a chattel mortgage, in which there was a verdict for the plaintiff, error in instructing the jury as matter of law that acceptance of certain money by the defendant mortgagee

would constitute a waiver of breaches of conditions of the mortgage relied on by him, instead of leaving that issue to the jury, was not made nonprejudicial error by the circumstance that on the evidence the jury could have found for the plaintiff on the ground that the foreclosure sale was invalid for want of proper notice, since they were not bound so to find. [688]

Evidence in an action for wrongful conduct of a sale in foreclosure of a chattel mortgage supported a conclusion that the sale was a controlled sale conducted in bad faith by the defendant pursuant to a scheme, entirely undisclosed to the mortgagor, to effect the sale as a means of giving the defendant a title to the mortgaged property good in all respects against the mortgagor and of cutting off all his title and beneficial interest, at substantially less than the market value of the mortgaged property, contrary to statements by the defendant that the sale was for the mortgagor's "protection" and he "had nothing to worry about." [688–689]

Damages resulting from wrongful execution of the power of sale in a chattel mortgage should be determined as in an action for conversion. [688–689]

At a trial in which the value of equipment wrongfully sold by the defendant was in issue, there was no reversible error in allowing the former owner to testify as to the value of all property of his listed on a blackboard in the court room, although some of the items listed thereon were not sold by the defendant, where the defendant made no motion to strike the irrelevant items and the judge instructed the jury to consider only the value of the items sold. [689–690]

On the issue at a trial of the fair market value of trucks wrongfully sold by the defendant there was no reversible error in the circumstances in admitting in the judge's discretion evidence of a value put on the trucks nearly fifteen months before such sale, and evidence of a statement as to the value of the trucks made by the defendant a few months before the sale. [690–692]

No abuse of discretion appeared at a trial in the exclusion of a letter to a witness offered to reflect on her credibility where it was not clear that the letter did so reflect and that it did not contain inadmissible irrelevancies. [692]

There was no reversible error in a trial judge's allowing a letter to go to the jury room as an exhibit without pasting over parts thereof derogatory of the defendant as the judge had agreed to do when the letter was offered, where the defendant did not later remind the judge to do so nor except to the letter going to the jury room unpasted. [692–693]

There was no reversible error at a trial in the admission of confusing and irrelevant testimony where it was not shown to be prejudicial. [693]

At the trial of an action for wrongful conduct of a mortgage foreclosure sale, there was no error prejudicial to the defendant in portions of the judge's charge wherein he stated that certain evidence tending to show an attempt by the defendant to withhold knowledge of the sale from one who had requested information concerning it might be "added to" other evidence of bad faith on the defendant's part. [693–694]

No prejudicial error appeared on the record in the unwise use of certain characterizations by the judge in his charge. [695–696]

There was no merit in an exception by the defendant in an action based on a statement in the charge that an auditor's report had a governing force "unless . . . contradicted and controlled by other evidence" where the judge also instructed the jury that other evidence had been introduced which might "tend to support or to contradict or control" the auditor's report, that they were to "take all the facts and circumstances . . . all the evidence . . . and . . . include the auditor's report as evidence, and arrive at . . . [their] own verdict," and that the burden of proof was on the plaintiff. [696–697]

There was no abuse of discretion nor error in an action in the denial of a motion for a declaration of a mistrial based on manifestly prejudicial remarks by the plaintiff's counsel concerning another case in argument to the jury, where it appeared that the remarks were made in answer to a prejudicial irrelevancy argued by the defendant's counsel and that, following the arguments and a noon recess, the trial judge denied the motion and in his charge emphatically instructed the jury to disregard the improper remarks by the plaintiff's counsel. [697–698]

In assessing damages in an action for wrongful sale of chattels by the defendant in foreclosure of a mortgage thereof, the amount of the mortgage debt was deductible from the value of the chattels at the time of the sale; it was immaterial that the mortgagor became bankrupt after the sale and that his trustee in bankruptcy was the plaintiff in the action. [698–699]

In an action for a wrongful mortgage foreclosure sale of chattels, the substantive right of the defendant to a deduction of the amount due him under the mortgage from the value of the property sold was open under a general denial. [699]

An exception in an action to the trial judge's failure to give a requested instruction which, though inaccurate, was sufficient to direct his attention to an applicable rule of law stood as an exception to his failure to state that rule to the jury without the excepting party's taking another exception after the charge. [700]

Where, in an action for wrongful sale of chattels by the defendant in foreclosure of a mortgage thereof, the amount of the mortgage debt by error was not deducted from the value of the chattels at the time of the sale in assessing damages and a verdict was rendered for the plaintiff for the full value of the chattels with interest from the date of the sale to the date of the verdict, and the amount of the debt was certain, this court in the circumstances, rather than ordering a new trial, under G. L. c. 231, § 124, ordered judgment to be entered for the plaintiff as on a verdict in the original amount less the amount of the debt and less interest on the amount of the debt from the date of the sale to the date of the verdict. [700–701]

TORT. Writ in the Superior Court dated November 6, 1953.

The action was tried before *Kirk*, J. On February 3, 1956, the jury returned verdicts for the plaintiff.

*Carlton W. Spencer*, (*Frank G. Allen, Jr., & Alfred Sigel* with him,) for the defendants.

*Charles C. Worth*, (*Joseph F. Coughlin* with him,) for the plaintiff.

WHITTEMORE, J. This is an action by a trustee in bankruptcy to recover damages from a nominal mortgagee, Sarah Mogul, and the owner of the beneficial interest in the chattel mortgage, Harold A. Leventhal, for alleged wrongful foreclosure of a mortgage of personal property of the bankrupt, Henry A. Nelson, shortly prior to the bankruptcy. Count 1 alleged that the foreclosure was illegal because there was no default and count 2 that the sale was improperly conducted.

An auditor, and thereafter the jury, found for the plaintiff. The jury verdict under each count was in the amount of $92,160. The case is here on the defendants' exceptions to the denial of motions for directed verdicts, mistrial and new trial, to the admission and exclusion of evidence by the auditor and at the jury trial, to the judge's charge, and to the failure to instruct in respect of the deduction of the amount of the mortgage debt from the amount of the verdicts. We state the facts as the jury could have found them in the view most favorable to the plaintiff. So much of the conflicting evidence as is relevant to the review of the charge is referred to in the opinion.

Nelson in 1952 and 1953 was in the trucking business with his wife. Beginning in March, 1952, Nelson borrowed money from the defendant Leventhal, a lawyer who engages in money lending, on the security of mortgages on Nelson's real estate and trucks. In November, 1952, the Nelsons brought suit against Leventhal to determine their indebtedness to him, and for other relief. In May, 1953, in settlement of the suit, it was agreed that Leventhal would lend an additional $8,447.37, thus making the total of the indebtedness to Leventhal $40,007.51, and that the Nelsons would sign a secured note for $44,008.26. The extra

$4,000.75 was a finance charge. The note was to be secured by a chattel mortgage on trucks and equipment and by certain real estate mortgages then outstanding to the defendant Mogul, Leventhal's bookkeeper. This settlement was carried out; the note was dated May 26, 1953, and the new chattel mortgage was given to Mogul as a straw for Leventhal. The new note was payable $2,000 each month beginning June 26, 1953, and the entire principal was due within one year from date "with the right to anticipate payments in whole or in part at any time with a proportionate rebate on the basis of a charge of $4,000."

In June the attorney who had brought the suit for the Nelsons and negotiated the settlement sent a bill to the Nelsons for his services which had been substantial and valuable. The cash resources of the Nelson business were then low and Nelson was distraught. He was worried that he could not pay the attorney's bill and objected to the amount. The June instalment of the mortgage was not paid when due.

On July 6, 1953, Leventhal talked with Nelson and later in the day with Mrs. Nelson about the sale of two mortgaged trucks. The conversations were such that it could have been concluded that Leventhal not only agreed to the sale, but also agreed to apply the proceeds ($4,350) on the instalments of the note, due and to come due. The proceeds were paid Leventhal on July 9, 1953.

At the July 6 conference Nelson complained of his attorney's bill, and told Leventhal he was pressed for money and pretty much disgusted. While he was still in Leventhal's office on July 6 Nelson was handed by a clerk a writing dated July 6, on the letterhead of Leventhal's associate, Joseph E. Levine, Esquire, notifying him of a sale on July 21, 1953, to foreclose the chattel mortgage for breach of its conditions. This took Nelson by surprise and he spoke to Leventhal about it. Leventhal told him in substance, "Don't be alarmed over it, it is just a matter of formality. Take it home and don't show it to anyone." Nelson did take the notice home, said nothing to his wife and left it

in a bureau drawer. On July 7 Mrs. Nelson found the notice and called Leventhal "who said it was just a formality, to forget about it — he wasn't going to do anything about it."

On or about July 10 the Nelsons, having been informed that interests friendly to the former attorney, who had indicated his intention to sue for his bill, were seeking to procure an assignment of the chattel mortgage, gave to Leventhal, at his suggestion, a written request not to give such an assignment "now or at any future date." On July 7 the attorney sued the Nelsons and attached their real estate. On July 15 the attorney, having learned of the foreclosure notice, and being anxious in his own interest to prevent foreclosure, wrote a letter to both defendants stating that he had been informed that the foreclosure notice had been revoked and demanding notice of the sale, a public auction and notice in the Boston papers. This letter was not answered and Mr. Levine thereafter on several occasions evaded a direct answer to the attorney's questions as to whether the sale had been cancelled. Leventhal was with Mr. Levine in the last of these conversations, held over the telephone.

In the period from July 6 to July 20 "the Nelsons had placed themselves in the hands of Leventhal partly because of his assurance that he would take care of them . . . and partly because they were willing to see . . . [the attorney's] claim defeated." They made no effort to prevent a foreclosure sale. Nelson testified he was "leaving it all in Leventhal's hands, which Leventhal told him to do."

On July 20 Leventhal called Mrs. Nelson on the telephone and said he would be at the Nelson plant in Framingham at 9 A.M. on July 21 and that he wanted her there. Mr. and Mrs. Nelson both went. Leventhal arrived with an auctioneer and two men, Newman and Wood. Leventhal said he was going to have a sale. Mrs. Nelson said "it was the first she'd known of it." The auctioneer put up a flag, and bidding started. Neither of the Nelsons protested. Leventhal at some time "said he was doing it for the Nelsons'

protection and that the Nelsons had nothing to worry about."

Only Wood, Leventhal and Newman bid at the sale. There were some other persons there. The property was sold to Leventhal for $18,000. Newman's high bid was $17,500. Newman was "highly experienced in the line of used trucks and road equipment and [knew] their value." Within ten days after the sale Newman bought from Leventhal so much of the mortgaged equipment as had been removed from the Nelson yard (not all of the mortgaged equipment) for $33,000. There was an agreement or understanding between Leventhal and Newman that Newman would not outbid Leventhal. The attempt was not made at the sale to receive the highest possible price. Through the use of two bills of sale (one purporting to show a sale for $11,200 of other equipment of Leventhal not covered by the mortgage and which was reconveyed by Newman for $1) Leventhal attempted to make the consideration of the sale to Newman appear to be $21,800.

On July 25 an attorney acting for one Mulhall, who was apparently ready to back Nelson in becoming reëstablished in business, and, through Mulhall, acting for Nelson, asked Leventhal what he meant by telling Nelson he "was not putting him out of business and that the foreclosure was for Nelson's protection" and said that Nelson had told the attorney that Leventhal had said that he would make an agreement so that Nelson could operate. After another call Leventhal told him to call with Mulhall but not with Nelson. On Sunday, July 26, 1953, the attorney and Mulhall called on Leventhal, and in response to the attorney's statement that his purpose was to learn what Leventhal meant by saying he wanted to protect Nelson, Leventhal said that there had been negotiations with one Leary with reference to Leary's taking an assignment of the mortgage and that he had only told Nelson that if that went through there would be no foreclosure. Leventhal gave the attorney a figure of $40,658.26 plus his expenses for an assignment of Leventhal's entire interest. The attorney was unable to

learn from Leventhal the total of these expenses and was finally told by Leventhal that Mrs. Nelson objected to his turning over the whole or any part of the equipment to Nelson without her approval and that he, Leventhal, felt bound by her objection. Nelson and Mrs. Nelson had had some domestic difficulties. The last talk of the attorney with Leventhal was on July 29, 1953, and within two days the trucks and trailers had been removed from Nelson's yard and the deal with Newman consummated.

Nelson at the sale "thought all the time that he might get two or three trucks out of this lot from Leventhal to use in a business way for himself after the sale. . . . The trucks remained in his yard until about the 30th of July and during this time following the sale, he tried to get a couple of the trucks from Leventhal after the bankruptcy to put in his brother-in-law's name so that he could work them. He continued friendly with Leventhal after the sale [at least until the first of the next year] and was negotiating with him right up to the time he was put into bankruptcy [on July 30] and this broke things off."

Mrs. Nelson purchased from Leventhal, after the sale, the Cadillac automobile covered by the mortgage. She later sold this and bought an Oldsmobile from Leventhal. She testified that she "was still friendly with Leventhal after the foreclosure sale and saw him after that frequently."

There was evidence that some of the claimed breaches of the mortgage existed on May 26, 1953, and were then known to Leventhal. There was evidence that on July 9, 1953, he knew of the breaches which existed on July 6. There was evidence of a Federal tax lien filed on July 8, 1953, and no evidence that Leventhal knew of it on July 9, 1953.

1. We notice the exceptions which relate to count 1 only to the extent necessary to show why the verdict under that count may not stand.

It was, we think, error for the judge to charge that, if Leventhal agreed to apply the July 9, 1953, payment of $4,350 on the current instalments, he waived defaults then

known to him.[1]  The defendants stress the evidence that the
pumps at Framingham did not belong to Nelson, and that
the mortgage did not prescribe a fifteen day grace period for
such default.  It did provide that in such event "the whole
amount then remaining unpaid under this mortgage . . .
shall, at the option of the holder hereof, immediately become
due and payable, and this instrument shall at Grantee's
option be considered in default."  The jury could have
found that Leventhal by July 6 had exercised his option to
make due the entire mortgage debt.  The defendants say
that, this being so, "the acceptance of the payment did not
waive all known breaches."  It is a partial answer to this
that if the entire mortgage debt had become due in early
July, there could be no *instalment* due thereafter, whether on
July 26 or on August 26, or on any other date, so that if
Leventhal on July 9 agreed to accept the proceeds of the
trucks in payment of the June and July instalments and
pro tanto on the August instalment he necessarily agreed
that the entire debt had not become due and payable.  But
the waiving of the default in payment and the relinquishment
of the option to consider the entire debt due did not in law
necessarily establish that Leventhal no longer considered
the instrument in default.  See *Joyner* v. *Lenox Savings
Bank,* 322 Mass. 46, 53–54.  The right to consider the in-
strument in default is not stated in the mortgage to be
dependent upon the whole debt being due.  There are also
the provisions "that all remedies herein or by law provided
shall be cumulative" and that upon any default the mort-
gagee may sell, first giving the mortgagor fifteen days'
notice in writing, and that, of the proceeds of sale, the
mortgagee "shall be entitled to retain all sums then se-
cured by this mortgage, whether then or thereafter pay-
able . . . ."

In these circumstances the correct instruction was, we

---

[1] "[I]f there were breaches which came into being after May 26, 1953, but
payment nevertheless was accepted by Leventhal on July 9 . . . such
breaches of condition would have been waived by the acceptance of the
$4,350, if that acceptance . . . was to be applied to the payments monthly
due on the note."

think, that the jury should determine whether the acceptance of the payment was a waiver of all defaults. See *Ross* v. *Vadeboncoeur*, 298 Mass. 523, 526.

We assume that the jury, even if they had found that there was not a waiver, could have found that Leventhal had so acted in respect of the notice of July 6 as to be estopped to rely on it and that there was an invalid sale because of the absence of valid notice. The action of the judge in letting the case go to the jury and in instructing as to the possibility of finding a "revocation" of the notice permitted such finding notwithstanding the more restricted allegations of the count. *Leigh* v. *Rule*, 331 Mass. 664, 667–668. But that did not make the instruction in respect of waiver of defaults nonprejudicial. The jury were not bound to find that the notice had lost its force, and the outcome under count 1 would then depend upon the fact of the existence of a default to support the defendants in taking possession and conducting a sale.

The defendants stress also their exceptions to the ruling in the charge that Leventhal's knowledge on May 26, 1953, of facts constituting breaches of the mortgage barred foreclosure for those breaches and, in view of the Federal tax lien filed on July 8, to the ruling which left to the jury the question of whether there was any default on July 21, 1953. In view of our holding above we need not determine whether in all the circumstances there was prejudicial error in these other aspects of the statement of the law governing the right to foreclose for breach of the mortgage under the notice of July 6.

2. There was no error in declining to direct a verdict under count 2. There was evidence to support the conclusion that the cause of action stated, a controlled sale in bad faith, had been proved. *Sandler* v. *Silk*, 292 Mass. 493, 496–497, and cases cited. *Seder* v. *Gibbs*, 333 Mass. 445, 453. *Union Mkt. Natl. Bank* v. *Derderian*, 318 Mass. 578, 581–583. Compare *Lexington Trust Co.* v. *McCabe*, 313 Mass. 733, 735, and *Andover Sav. Bank* v. *Basha*, 326 Mass. 725, 727–728, and cases cited. Damages in such a case should be

determined as in an action for conversion. *Castro* v. *Linchitz,* 297 Mass. 381, 387–388.

Even apart from the effect of the auditor's report, which found bad faith in the sale, for Leventhal's personal profit, and was sufficient to take the case to the jury, there was no evidence requiring the conclusion that the Nelsons acquiesced in the scheme which the jury could have found in fact to have existed, and to have been entirely undisclosed to the Nelsons — a scheme to give the defendants a title, good in all respects against the plaintiff, at substantially less than the market value of the mortgaged equipment. See *Flynn* v. *Curtis & Pope Lumber Co.* 245 Mass. 291; *Bennett* v. *Bailey,* 150 Mass. 257, 260; *James F. Monaghan Inc.* v. *M. Lowenstein & Sons Inc.* 290 Mass. 331, 334–335; *Union Mkt. Natl. Bank* v. *Derderian,* 318 Mass. 578, 583–584.

We need not determine whether there was evidence requiring the conclusion that the Nelsons irrevocably acquiesced in Leventhal's having the appearance of title in order to defeat or delay the attorney. In any event we do not think this required the conclusion that Nelson had acquiesced in or ratified the sale as a legal proceeding cutting off Nelson's title and all his beneficial interest. There is shown no agreement between Leventhal and Nelson which must be ruled to be illegal.

3. There was no reversible error in the admission and exclusion at the trial of evidence relevant to count 2.

Nelson was asked to give his opinion of the fair cash value of the foreclosed pieces of equipment on July 21, 1953. With the judge's permission, an attorney for the plaintiff wrote on a blackboard the name of each item and the stated value as Nelson gave it. The list included equity in land $30,000; equity in Natick home $20,000; Cadillac $1,200; 1946 and 1947 trucks $4,350; and showed the total of all the figures, $132,850.

The judge's ruling that the blackboard might be used was after Nelson had answered the question in part, that is, as to the value of the ten wheeler trucks ("$10,000 apiece")

and was followed by a conference at the bench after which the attorney for the defendants said, "Note my objection then, and note my exception to the line of inquiry." The bill of exceptions, after setting forth a copy of the list and stating that the board with chalked figures remained in the court room for five days until upon request of the defendants' counsel it was turned away from the jury, and that it faced the jury again during the argument of the plaintiff's attorney, states as follows: ". . . [The defendants' attorney] made objection and duly saved exception to the preceding line of examination . . . wherein the witness was asked to give an opinion which he said he had 'as to fair cash value' of each piece of equipment referred to on the board chalk and 'the fair cash value' of the equity in the Natick and Framingham real estate, all of which totaled $132,850." We construe this as a restatement in the bill of the exception taken after the bench conference. The figures for items not includable in the computation of damages would properly have been excluded from this list which was made in answer to a question of the fair cash value of "these various pieces of equipment." We need not determine if, on the question of whether Leventhal on July 6 reasonably deemed his interest under the mortgage "to be jeopardized," the value of other property was relevant. The issue is controlled by the fact that no motion to strike from the list the irrelevant items was made by the defendants. Furthermore the judge instructed that, as to damages, the "inquiry is this: What was the fair market value of all the items sold as of July 21, 1953, as they stood on the premises at Framingham?"

It was not reversible error to allow in evidence a promissory note from Nelson to Leventhal for $26,432 dated April 23, 1952, being a note "which related to the transaction of the two ten wheelers previously sold by Leventhal to Nelson." In view of the length of the time interval, the possibility of rapid depreciation of automotive equipment, particularly in heavy use, and the absence of evidence of the relative condition of the trucks on the respective dates,

there was clearly a sound basis for excluding this testimony as any evidence of value of the trucks on July 21, 1953. But the force of this testimony was cumulative. There was later in the case evidence, properly admitted (see *post*), that Leventhal at a time between November, 1952, and May 26, 1953 (and likely nearer to May than to November), had valued the two ten wheeler trucks at $15,000 each. Furthermore Nelson, as stated, had testified that the value of these trucks on July 21, 1953, was the lesser figure of $10,000 each. Nelson also testified, without objection or exception, that he "went with Leary to see Leventhal when Leary said he had twenty-five to forty thousand to put in [the] business. . . . Leventhal said he should put in more because [the] business was worth $100,000 not including the real estate; that he had a man offering $10,000 apiece for the ten wheelers." The note therefore vouched to some extent that there was a basis for Nelson's and Leventhal's figures of $10,000 each for the trucks. The likelihood that, because of the note, any higher figure than Nelson's would be found as of July 21, 1953, was practically nonexistent. Anyone would expect that trucks would have sold for more in 1952 than they were worth in 1953. While such considerations may not give independent ground for admission of the evidence they do minimize the likelihood of harm. The case underlying *Johnston* v. *Cassidy*, 279 Mass. 593, and *McCarthy* v. *Simon*, 247 Mass. 514, 521, relied on by the defendants, is *Vahey* v. *Bigelow*, 208 Mass. 89, 93, which holds that the fact alone that the estate was sold for less than its value did not make the sale invalid. There is wide discretion in the trial judge to determine what evidence of value shall be deemed admissible in the circumstances. See *Schneider* v. *Hayward*, 231 Mass. 352, 357; *Brockton Sav. Bank* v. *Shapiro*, 311 Mass. 695, 698; *Lembo* v. *Framingham*, 330 Mass. 461, 463.

There was no reversible error in admitting the testimony of Nelson's former attorney that Leventhal had stated, at a time which, it could be inferred, was a few months before July, 1953, that he considered the value of two of three ten

wheeler Macks to be $15,000 for the two and the value of the third to be $7,000 and that the worth of the business was $70,000. The nearness in time made relevant in the discretion of the judge Leventhal's statement of the value of the trucks. The worth of the business was not the issue but the questions to which exception had been taken were addressed to the conversation in which the value of the equipment had been stated. There was no motion to strike the testimony as to the value of the business and the basis for a claim of reversible error does not exist.

No prejudicial error is shown in the exclusion of a letter from attorneys in Framingham representing a bank. Mrs. Nelson testified that she "could not say what the Framingham Trust Company was owed for and did not know that it had a judgment." Counsel for the defendants said, "I show you this letter from the law firm in Framingham dated July 22, addressed to you and your husband — do you remember receiving it, [and] taking it in and giving it to Leventhal? . . ." A. "Yes. I don't remember taking it in to him." An offer was then made and the letter was excluded. The attorney for the defendants said, ". . . The witness has testified that she did not know of the claim represented by a judgment of $1,220.36 and I therefore offer the letter received by her . . . ." On this offer of proof it is at best not clear that the letter reflected on Mrs. Nelson's credibility and did not contain inadmissible irrelevancies. In any event, it does not appear that the trial judge abused his discretion in excluding it. See *Jennings* v. *Rooney,* 183 Mass. 577, 579; *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 593.

There was no reversible error in allowing two exhibits to go to the jury room without parts of them pasted over. These exhibits were the letter which accompanied the attorney's bill, and the bill itself. The letter contained comments derogatory of Leventhal. When the exhibits were offered the defendants' attorney said, "I understand that part of this letter is not to be read to the jury." The judge said, "Before it goes out, we will see it is pasted or some

measure taken." The bill of exceptions recites, "This measure was not taken before . . . [the case] went to the jury." There is no indication that counsel reminded the judge of the plan. Counsel had the primary responsibility to see that indicated steps were taken in his clients' interest. No exception was taken to the act of letting the exhibit go to the jury room unpasted.

There was no reversible error shown in allowing a bankruptcy attorney to testify that on July 28, 1953, the solvency of Nelson depended on whether there had been a legal or illegal sale, and that "[i]f it were an illegal sale on July 21, 1953," he would say that "on June 10, 1953," when according to the petition he, while insolvent, permitted a creditor to obtain a lien by legal proceedings, Nelson "definitely was solvent — I mean insolvent." This testimony was confusing and irrelevant under the declaration, and, as to the June 10 date, involved a doubtful statement of law which if relevant would have been for the judge. However, we cannot say that, even if its import was grasped by the jury, the testimony was prejudicial. The fact of Nelson's bankruptcy was in the case; that the loss of the equity in the equipment was relevant to Nelson's solvency was obvious, and the jury's knowledge that a bankruptcy attorney believed the values to be such that it was a critical consideration in respect of solvency on July 28 was not, we think, of any great moment.

4. There was no prejudicial error in the charge in respect of count 2 or on general aspects of the case which would affect the plaintiff's right under count 2.

It was not prejudicial to charge as follows: "There was testimony here that . . . [Nelson's former attorney] called Mr. Levine and asked him, 'Is the sale on or off?' . . . [The attorney] was no secured creditor. He had no right to expect or to insist that Leventhal or his attorney, Levine, write him . . . a letter and say it is on or off, but if . . . [the attorney] did ask that question, he had a right to an honest answer. Did he get it? If he did, O.K. If he didn't, there is something else which may be added to the

evidence which might warrant you in finding that there was bad faith. There was correspondence between . . . [the attorney] and the Leventhal office . . . in which he made certain requests for information and made certain statements. Do you say that good faith and fair dealing under the circumstances required a reply rather than to leave a man under a misapprehension, if there was a misapprehension, as to what the true state of affairs was?" With the other evidence supporting the view of bad faith toward Nelson, the evidence was relevant to show an attempt to withhold knowledge of the sale from an attorney whose presence might have made failure of the scheme more likely. It would have been appropriate and better for the judge to have stated also that this evidence might be found to show only an intent against the attorney, but the defendants did not, either before or after the charge, request this.

There was no prejudicial error in charging as follows: "Sometimes it is said that the failure of the mortgagor to protest, . . . to demand an adjournment of the sale, could be considered as acquiescence . . . and that's a fair statement, but it is to be judged in the light of the facts which existed. Was there a sense of futility in making protest? Was there surprise that the show was on at all that would still the tongue of one who otherwise, had he known the facts, would have made a protest. . . . Of course, in addition, and by way of defence, we have the broad assertion that the foreclosure was initiated, it was accomplished at the express will and desire of Mr. Nelson, irrespective of any breach or known breach of conditions. It is the contention of the defence here that this was a friendly foreclosure, and that Leventhal . . . was merely complying with the deep seated desire of Mr. Nelson. Having assumed the role of guide, counsellor, friend, and protector, he would carry it out for him. Is that the fact, or isn't it? It is a question of fact, and it is for you to seek the answer. If the foreclosure and the sale was done at the behest of Mr. Nelson, he can't complain. But he does complain, he says that wasn't so, and, 'I got this letter in my hand, and I was stunned and

shocked,' so there again you have a question of where is the truth." This was followed by additional statements to which no exception was taken as follows: "Also, there is evidence here which, if believed, would warrant the jury in finding that there was acquiescence on the part of Nelson as to all which had been done up to and including July 21, 1953. The sale of the car to the wife, visit to the office for completion of certain papers relating to real estate — it is for you to say whether or not you construe those events as constituting an intention on the part of Nelson to say, 'The deal is O.K.; I am content; I have no complaint.' Or, were such events, if they did take place, part of the spidery pattern that would, in the end result amount to what has been referred to as cumulative evidence to show that they were content if an inquiry should be made."

The use of words which have emotional overtones to characterize one aspect of the case and not the other runs the risk of prejudicial error in showing the judge's view of the facts or of who among the witnesses was or was not telling the truth. The characterizations "sense of futility" and "surprise . . . that would still the tongue" which the defendants specifically refer to point out one possible explanation for the failure of the Nelsons to object. The alternative explanation, that is, approval and acquiescence, was also stated. We do not think that the emphasis resulting from the choice of words, which is present in the one statement only, while inadvisable, is ground for reversal. The words "stunned and shocked," also specified as prejudicial by the defendants, should not have been used. But we think that they were undoubtedly understood by the jury to be a statement of the contention of the plaintiff of the effect on Nelson of the notice of July 6 and not an attempt to quote his testimony or to take from them their function of determining just what words were used. Other words used such as "spidery," as well as the clause "Having assumed the role of guide, counsellor, friend, and protector," lend an emotional suggestion and were of the kind better not used in the charge. But if the jury believed that the

sale was conducted in bad faith, the acts evidencing that bad faith spoke their own condemnation and we do not think that the judge's words, so far as they carry a suggestion of what he thought of them, assuming that view was accepted, can be ruled to have had such a prejudicial effect as to require reversal. See *Commonwealth* v. *Taschetta*, 252 Mass. 158, 161; *Bernasconi* v. *Bassi*, 261 Mass. 26; *Hohman* v. *Hemmen*, 280 Mass. 526; *Hathaway* v. *Checker Taxi Co.* 321 Mass. 406, 409–411; *Whitney* v. *Wellesley & Boston St. Ry.* 197 Mass. 495, 502. Compare *Commonwealth* v. *Foran*, 110 Mass. 179; *Commonwealth* v. *Barry*, 9 Allen, 276; *Hayes* v. *Moulton*, 194 Mass. 157, 165; *Federal Natl. Bank* v. *O'Keefe*, 267 Mass. 75, 83; *Cahalane* v. *Poust*, 333 Mass. 689.

There was no error in the charge as to the evidential value of the auditor's report. The defendants object to the word "controlled" in the following statement: ". . . [The auditor's report] has . . . up to a certain point a compelling special or artificial force which must be given its full force and effect unless it is contradicted and controlled by other evidence." The clause "unless . . . contradicted and controlled by other evidence" has been used in the statement of the governing principle in several cases. See *Ryan* v. *Whitney*, 257 Mass. 218, 223; *Solomon* v. *Boylston Natl. Bank*, 269 Mass. 589, 592. And see *Lovell* v. *Commonwealth Thread Co. Inc.* 280 Mass. 243, 246. In *Cook* v. *Farm Service Stores, Inc.* 301 Mass. 564, 568–569, we held that the judge properly declined to instruct that the auditor's report had "a special evidential character [or weight], which in the absence of controlling evidence, either stated in the report or put in outside the report, must be considered by the court and jury as final." We held that the words "controlling evidence" were ambiguous as meaning either evidence warranting a finding contrary to that of the auditor, or meaning evidence accepted by the tribunal of fact in preference to the finding of the auditor, and that, if the former meaning was intended, the request, on the facts, was a mere abstraction, and that the second meaning "comes close to

the heresy that an auditor's report may change the burden of proof." But in the case before us what the judge meant was shown in the statement which followed in the charge: "And so, both parties have availed themselves of the right to introduce other evidence which may tend to support or to contradict or control this auditor's report. So . . . You take all the facts and circumstances in the case, you take all the evidence you have heard, and you include the auditor's report as evidence, and arrive at your own verdict on this controversy." This last statement put the auditor's report in its proper place. The judge had earlier charged, appropriately, that the burden of proof was on the plaintiff. There is no basis for the defendants' argument that the use of the word "controlled" must have led the jury to believe that something more than contradictory evidence was required or that the burden of proof had shifted.

5. There was no error in the denial of the defendants' motion for a mistrial or a new trial on the ground of the plaintiff's counsel's prejudicial remarks in argument to the jury. The defendants' counsel had stated in argument that "never in all his long experience as an attorney had he seen a case involving a bankrupt in which there had been enough money recovered so as there would be something left over for the bankrupt himself." Subsequently, the plaintiff's counsel in his argument said: "'You have heard what . . . [the defendants' counsel] said about there never being anything left over for the bankrupt himself,' and went on to say that he had previously conducted another case against Leventhal which was similar to this case, and that in the other case he was able to get enough money from Leventhal to pay all the creditors in that case, and return the business to the widow." No previous mention of this other case had been made. This statement was manifestly prejudicial. However, it is the rule in civil cases that the declaration of a mistrial is in the sound discretion of the trial judge who is in a position to determine the effect on the minds of jurors and whether it was too strong to be removed. *Shea* v. *D. & N. Motor Transp. Co.* 316 Mass. 553, 555. *Hess* v. *Boston*

*Elevated Ry.* 304 Mass. 535, 540–541. See *Jones* v. *Spering,*
334 Mass. 458, 461. The trial judge appropriately instructed
the jury to disregard the improper remarks. He said,
". . . That argument was an improper argument. Counsel
cannot import into the argument or trial of a particular case
any personal experience which he may have had in another
case. I therefore say to you, and I stress it with all the em-
phasis I can, that I hope the jury will disregard that refer-
ence . . .. It was not proper comment, and it is the duty
of the court to direct the attention of the jury to the fact
that it was not proper comment, and I am sure you will dis-
regard it. . . . I cannot excuse . . . [the attorney] for what
he did, but doubtless in the fervor which he felt for the cause
he was expounding, he was remiss in making that statement
to you. You will do your duty by me and everyone involved
here if you will just chuck it out." There is nothing in the
defendants' contention that these emphatic instructions
were "precatory rather than mandatory" and that the jury
were left with the impression that "they would be doing the
court a favor" if they ignored the remark. The precise
wording of such a statement is of course to be left to the
discretion of the trial judge. Leventhal's counsel moved for
a mistrial at the close of the argument, just before the lunch-
eon recess. The judge said he would hear a written motion
for mistrial at two o'clock. It was then denied. We do not
think the additional intervening time of the noon recess
before the judge's charge is significant. The effect of the
remark and the sufficiency of the steps taken to overcome it
must, as in every case, be judged with reference to the entire
case as it stood before the jury. In particular, the judge was
entitled to give weight to the fact that the statement by the
plaintiff's counsel was in answer to a prejudicial irrelevancy
argued by opposing counsel.

6. It was error not to have given, in modified form, the
instruction requested in respect of deducting the obligations
of Nelson on the note. The principle is well established that
in an action for conversion the amount of the debt due the
defendant and secured by a lien on the converted property

is deductible from the value of the property at the time of the conversion and it is the balance which the plaintiff is entitled to recover. *Farrar* v. *Paine*, 173 Mass. 58. *Fowler* v. *Gilman*, 13 Met. 267. *Whitman* v. *Boston Terminal Refrigerating Co.* 233 Mass. 386, 391. *Perry* v. *Manufacturers Natl. Bank*, 305 Mass. 368, 372. *Castro* v. *Linchitz*, 297 Mass. 381, 389. Compare *Nelson Anderson, Inc.* v. *McManus*, 334 Mass. 394. The deduction is not by way of recoupment, but is a substantive right, and a general denial presents the point. *Farrar* v. *Paine, supra.*

The bill of exceptions shows no basis for applying a different rule. Compare *Chamberlin* v. *Shaw*, 18 Pick. 278. The fact of Nelson's subsequent bankruptcy is not relevant. The trustee in bankruptcy, as the plaintiff here, is asserting Nelson's right at the time of the sale. The auditor's report finds that the real estate mortgages, which also secured Nelson's debt, were foreclosed later in 1953, and that the proceeds of the sales ($25,750) are held under a stipulation between the defendant Mogul and the trustee in bankruptcy of Nelson, the plaintiff here. We need not determine what the rule should be where other security, unliquidated, remains in the defendant's hands. Here the other security is liquidated and so held that its proper application is assured. We think in the circumstances there was no basis for not allowing deduction from the plaintiff's recovery of the amount due on the mortgage.

There was no question on the evidence that the amount due was at least the face of the note less the July 9, 1953, payment, and less that part of the finance charge of $4,000 which would be apportionable to the period from May 26 to July 21, 1953. The trial judge's orders on the motions for a new trial, entered March 22, 1956 (later expunged by his orders of June 1, 1956), reduced the verdict by the sum of $36,324.26. This figure, we compute, is what remains after deducting from the principal of $44,008.26 the sums of $4,350 (the July 9 payment) and $3,334. This latter sum is ten twelfths of $4,000. It is immaterial that the defendants might have shown other amounts secured by the

mortgage, such as the defendants' costs, legal expenses and attorneys' fees. For purposes of this case the indebtedness was no less than the amount computed by the trial judge.

The defendants' relevant request read, "If the jury should find that the defendants had converted the chattels as set forth, the plaintiff is entitled only to the value of the chattels so converted less the amount of the principal obligation as set forth in the undisputed note." Though inaccurate, this was sufficient to direct the judge's attention to the correct rule of law. *Bergeron* v. *Forest*, 233 Mass. 392, 402. *Roche* v. *Gryzmish*, 277 Mass. 575, 580. *Bell* v. *Dorchester Theatre Co.* 308 Mass. 118, 123. The exception to the failure to give the request stands as an exception to the failure to state the rule and is not wiped out by the failure to take another exception to that part of the charge which stated that the jury should find the fair market value of the property.

One ground of the defendants' motions for a new trial was that the verdicts were excessive. The judge, in connection with ordering reductions in the verdicts, gave the request "If any damages were properly awarded by the jury such damages could only be the values of the chattels converted less the amount of the principal obligation of the note which was in evidence or the amount due thereon." The defendants duly excepted to the orders which expunged the orders of reduction. Appropriate action on the motions for a new trial under G. L. c. 231, §§ 127, 128, would have been that there be a new trial unless the plaintiff should remit the appropriate amount. In the circumstances under G. L. c. 231, § 124, it is not necessary for us to order a new trial. It is plain that the amount owed the defendants was not deducted by the jury and the amount which should have been deducted is certain. Under the instructions given the verdict includes interest from July 21, 1953, on the full amount which the jury found to be the value of the property. There must therefore be deducted from the amount of the verdict ($92,160) not only the amount due on the mortgage ($36,324.26), but also interest on this sum from July 21, 1953, to February 3, 1956 ($5,528.55), or a total of $41,852.81.

The rescript will provide that judgment be entered as though the verdict under count 2 had been for $50,307.19. *Stebbins* v. *North Adams Trust Co.* 243 Mass. 69, 76. *Matthews* v. *New York Cent. & Hudson River R. R.* 231 Mass. 10, 19. *Graustein* v. *H. P. Hood & Sons, Inc.* 293 Mass. 207, 222.

7. We have considered all the points relevant to count 2 argued by the defendants, including those not specifically referred to, such as the exception to the admission of parts of the auditor's report, and find no other errors. The action on the motions for a new trial on the other grounds alleged was within the judge's discretion. We cannot say on the evidence of Nelson of the fair value of the property sold on the day of the sale ($77,300) and on the evidence of statements of Leventhal as to value, and some evidence indicative of higher values, that, with the necessary inclusion of interest, the verdicts were without support on the evidence. We do not know what evidence of damage, if any, underlay the auditor's finding of $35,000 other than the sale price to Newman of $33,000. The high award is occasion for careful consideration of possible prejudice and in particular of the cumulative effect of the parts of the argument and charge to which exceptions were taken. We conclude after such consideration that a new trial is not required.

> *Judgment to enter for the plaintiff under the second count as on a verdict for $50,307.19.*