IRENE LUCCIARDI CLOUGH, administratrix, *vs.* NEW ENGLAND
TELEPHONE AND TELEGRAPH COMPANY
(and three companion cases[1]).

Bristol.    October 3, 1960. — February 7, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE,
& CUTTER, JJ.

*Negligence,* Electricity, Duty to warn, Violation of rule, Violation of law.
    *Proximate Cause.*

A finding of negligence on the part of an electric company was not war-
    ranted by evidence that after it had strung on poles and energized
    uninsulated, high voltage wires over a partially constructed highway
    overpass, without posting any warning signs, a mobile crane with an
    experienced crew was brought to the overpass to move coping stones
    into place, and that while the boom of the crane was in a position with
    its tip above and several feet away from the wires and members of the
    crew on the ground were maneuvering into place a stone attached to
    the end of the cable hanging from the boom, the cable got close to one
    of the wires and the current arced from the wire to the cable and in-
    jured such members.    [35–36]
Injuries sustained at the site of construction work by members of the
    crew of a mobile crane when electric current arced to the cable of the
    crane from a recently installed high voltage wire of an electric company
    were not the proximate result of a failure to comply with a rule of the
    company requiring its employees to report to their supervisors the
    conditions of areas where high voltage wires were to be installed, or of
    a failure to comply with statutory provisions requiring the company to
    obtain a location for the electric line from public authorities.    [36–37]

FOUR ACTIONS OF TORT.   Writs in the Superior Court dated
April 21, 1954, and September 7, 1954.

The actions were tried before *Smith,* J.

*Leon F. Sargent,* for New England Telephone & Tele-
graph Company.

---

[1] The companion cases are Irene Lucciardi Clough, administratrix, *vs.* New
Bedford Gas and Edison Light Company, Ambrose Knight *vs.* New England
Telephone and Telegraph Company, and Ambrose Knight *vs.* New Bedford
Gas and Edison Light Company.

*William J. Fenton,* for New Bedford Gas and Edison Light Company.

*Charles R. Desmarais,* for the plaintiffs.

SPALDING, J.   These are four actions of tort to recover for the conscious suffering and death of James Lucciardi and for personal injuries to Ambrose Knight, sustained when an electric current ran from a high voltage wire to a cable of a crane with which they were working.   Knight and Irene Lucciardi Clough, administratrix of the estate of James Lucciardi, each bring an action against the New Bedford Gas and Edison Light Company (light company) and the New England Telephone and Telegraph Company (telephone company).   In a trial to a jury verdicts were returned for the administratrix of Lucciardi against each defendant on the death counts alleging negligence.   Verdicts were likewise returned for Knight against each defendant on counts for negligence.   The cases come here on the defendants' exceptions to the denial of their motions for directed verdicts.

The relevant evidence was as follows.   In 1951 and 1952 an overpass at Copicut Road in the town of Freetown was being built over the Boston-Fall River Expressway.   In December, 1951, two poles which were jointly maintained and used by the defendants were moved from the northerly side of Copicut Road to a point near a temporary road that was being used for public travel during construction of the overpass.   In June or July of 1952, at the request of the Commonwealth's assistant resident engineer (Keating), the telephone company moved the poles to permanent locations designated by Keating on the northerly side of the overpass, one about twenty-five feet east of the easterly abutment of the overpass, and the other about twenty-five feet west of the westerly abutment.   The span of the overpass was about 210 feet and the distance between the poles was about 270 feet.   Between July 29, 1952, and August 1, 1952, the light company attached two uninsulated copper wires bearing a current of 4,400 volts to cross arms on the tops of the poles.

The cross arms were twenty-eight feet three inches above the surface of the overpass. The sag of 268 feet of the wire would be between one and two feet. No danger or warning signs were attached to the poles. An engineer of the light company was on the scene in June or July, 1952, and it was apparent to him that construction in the vicinity of the overpass was not finished. A rule of the light company required its employees to report to their supervisors the conditions of the areas where high voltage wires were to be installed, but no such report was made here.

The masonry work on various overpasses on the expressway (including the Copicut Road overpass) was let out by the general contractor to one Paltrineri as subcontractor. This work involved the placing of coping stones (facing or ornamental stones) "on the outside of . . . [the] bridge." The coping stones "had to go on the overpass before the general contractor could pour the sidewalls." On September 8, 1952, Paltrineri brought his crew and equipment (which consisted of a mobile crane mounted on a chassis) to the Copicut overpass. The general contractor "was anxious to get his part of the job done so he was after Paltrineri to get . . . [a] particular stone [weighing 350 pounds] in . . .." Paltrineri's crew consisted of Cronin, who operated the crane, Knight, Lucciardi, and three others. The crew was using this crane to place the coping stones in position. The men would guide a stone to its proposed position and the crane operator would lower the stone into place by loosening the cable. The crane had a boom fifty feet in length, the radius of which "could be lowered or raised by moving levers." All members of the crew were experienced men "who had worked around construction work and they had seen where you have to avoid electric wires." Before the work began on September 8, Paltrineri noticed that the overhead wires "seemed to be directly over the place where the stones were to be set . . . [and thought] that it would be impossible to set the stones in a normal manner with a high boom without touching the wires." Accordingly, he instructed the crew to use a "flat boom" in "spotting the stones." Knight testified in sub-

stance that this warning was given by Paltrineri. There was evidence that Lucciardi was present when it was given, but there was also evidence that he did not arrive on the job until after it was given. Cronin, the operator of the crane, recognized the danger in operating a crane in the vicinity of highly charged wires and warned the crew to "watch the wires."

At the time of the accident Lucciardi, Knight, and Anthony Cedrone were guiding a 350 pound stone into position. The stone was attached to a chain which was hooked onto the end of the steel cable of the crane that extended from the pulley located at the top of the boom. The crane operator was moving the stone with a "flat boom" to get under the wires, which were not more than twenty-five to thirty feet above the overpass.[1] The chassis was in the center of the overpass and the tip of the boom, pointed in a northwesterly direction, was about five feet south of and about twelve feet higher than the wires that extended along the north side of the overpass. When the accident occurred the boom was in a "stopped locked position" and had been stopped for "a matter of seconds." Lucciardi was standing at the center of the stone, flanked by Knight and Cedrone. Lucciardi gave the crane operator a hand signal to lower the cable. As the men maneuvered the stone into position the electric current arced from a wire to the cable, knocking the three men to the ground. Knight was injured, and Lucciardi sustained injuries which resulted in his death.

When the men fell, the crane operator saw that the cable was not more than twelve to fourteen inches from the wire and that an arc of electricity extended from the wire to the cable.[2] The boom was still about five or six feet from the wires.

Both defendants contend that the evidence failed to estab-

[1] There was evidence, however, that after Paltrineri left the job, and before the accident, the crew decided that it would be easier to do the work with a high boom instead of a flat one. Thus they "raised the boom" (so that it was higher than the wires) and "drifted the stone."

[2] There was evidence that the electricity would arc if a metal cable came as close as one eighth to one quarter of an inch from the wire, and that once the arcing occurred it would follow the cable, if moved away, for a distance of several inches to a foot.

lish negligence as matter of law, that Lucciardi and Knight
were guilty of contributory negligence, and that they as-
sumed the risk of the accident. The telephone company
also contends that it was not responsible for injuries caused
by the electric company's wire. The initial question is
whether there was enough evidence of negligence to go to
the jury. The electric company, of course, was not an in-
surer. It was required to exercise care that was reason-
able in the circumstances. But inasmuch as electricity is
a highly dangerous force, those employing it are properly
held to exercise care that is commensurate with the risk.
*Edgarton* v. *H. P. Welch Co.* 321 Mass. 603, 610. See
*O'Donnell* v. *Boston Elev. Ry.* 205 Mass. 200, 202. In situ-
ations similar to that here, liability or nonliability is nor-
mally not based on any single act or omission of the power
company, although special attention has been given to a few
specific acts or omissions, such as the failure to provide or
maintain effective insulation, the height of the power wire
with regard to the area in which it is located, or the fail-
ure to give adequate warning in the face of a dangerous
condition.

The gist of the plaintiffs' argument is that the light
company was negligent in failing to guard the workmen
"against . . . [the] danger of electrical shock." More
specifically, it is contended that both the "defendants were
negligent in moving back the poles and wires and ener-
gizing the wires with a high voltage . . . when they knew
or should have known that the overpass was only partially
completed, and should have reasonably anticipated that
cranes or other machinery would be used by the workmen."

We are of opinion that the cases ought not to have been
submitted to the jury. There was no indication that the
manner in which the poles were erected, the height of the
poles, the lack of insulation, or the failure to post warning
signs was a departure from the practice in common use,
although, of course, that fact would not be conclusive on
the issue of negligence. See *Corthell* v. *Great Atl. & Pac.
Tea Co.* 291 Mass. 242, 243–244, and cases cited. It is clear
from the evidence that the existence of the wires was open

and obvious and that Paltrineri's men were experienced construction workers who were aware of the dangers of operating a crane in the vicinity of high voltage wires. The situation here is different from those in the cases cited by the plaintiffs where it was held that the defendants should have anticipated that work might be done in close proximity to the wires. *McCrea* v. *Beverly Gas & Elec. Co.* 216 Mass. 495. *Philbin* v. *Marlborough Elec. Co.* 218 Mass. 394. *Royal Indem. Co.* v. *Pittsfield Elec. Co.* 293 Mass. 4.

There are situations, no doubt, where an electric company may have a duty to warn, but a duty to warn does not arise "unless the person on whom the duty would be cast has some reason to suppose that a warning is needed." *Cadogan* v. *Boston Consol. Gas Co.* 290 Mass. 496, 499–500. See *Grebenstein* v. *Stone & Webster Engr. Corp.* 205 Mass. 431, 437; *Hyland* v. *Seaver*, 312 Mass. 535, 539; *Hannon* v. *Hayes-Bickford Lunch Sys. Inc.* 336 Mass. 268, 272. The light company could have assumed that those engaged in the construction of the overpass would recognize the open and obvious danger inhering in the wires, and would either request that the electricity be shut off or use equipment which would not come close to the wires. See *Hayden* v. *Paramount Prod. Inc.* 33 Cal. App. 2d 287, 291; *Buell* v. *Utica Gas & Elec. Co.* 259 N. Y. 443; *Luketich* v. *Duquesne Light Co.* 389 Pa. 87; *Wilson* v. *Texas Elec. Serv. Co.* 265 S. W. 2d 624 (Tex. Civ. App.). The place where Knight and Lucciardi were injured would not be dangerous to persons performing the work in a prudent and careful manner; it became dangerous solely because the crane was operated imprudently — a situation that the defendants could not reasonably be held to anticipate. That fact rather than any negligence on the part of the defendants was the proximate cause of the accident.

The plaintiffs contend that the failure to observe the light company rule requiring employees of the company to report to their supervisors conditions in the areas where high voltage wires were to be installed was evidence of negligence. In appropriate circumstances "a violation of rules previously adopted by a defendant in reference to the

safety of third persons has generally been admitted in evidence as tending to show negligence of the defendant's disobedient servant for which the defendant is liable." *Stevens* v. *Boston Elev. Ry.* 184 Mass. 476, 478. Although it might be found that the rule in question was designed to protect third persons, there is nothing to show that the light company would or should have acted differently if a proper report had been made. The violation of the rule was a condition and not a cause. *Shaw* v. *Boston Am. League Baseball Co.* 325 Mass. 419, 423–424. *Kralik* v. *LeClair*, 315 Mass. 323, 326–327.

Similarly the plaintiffs contend that the defendants did not comply with statutory requirements for the installation of the wires and that this was evidence of negligence.[1] We assume that the procedure outlined in the statute was applicable and was not complied with. We are of opinion, however, as in the case of the company rule just mentioned, that the violation of the statute had no causal connection with the accident on September 8, 1952. See *Kralik* v. *LeClair, supra,* at pages 326–327.

Since, as we hold, the plaintiffs failed to establish negligence on the part of either defendant, there is no need to decide to what extent, if any, the duties of each defendant with respect to the poles and wires might be different.

The defendants' exceptions to the denial of their motions for directed verdicts must be sustained and judgment in each case is to be entered for the defendant. G. L. c. 231, § 122.

*So ordered.*

---

[1] General Laws c. 166, § 22, provides in part: "A company desiring to construct a line for such transmission [of electricity] upon, along, under or across a public way shall in writing petition . . . the selectmen of the town where it is proposed to construct such line for permission to erect or construct upon, along, under or across said way the wires, poles, piers, abutments or conduits necessary therefor. . . . [T]he board of . . . selectmen may by order grant . . . a location for such line . . . . After the erection or construction of such line, the board of . . . selectmen may, . . . upon petition of the company without notice or hearing, by order . . . direct an alteration in the location of the poles . . . ." The accident occurred on September 8, 1952. The wires were moved and energized between July 29, 1952, and August 1, 1952. A petition was not submitted to the board of selectmen of the town of Freetown until September 15, 1952, and permission to relocate the poles was not given until October 6, 1952.