JOHN E. NISBET *vs.* ANTHONY J. MEDAGLIA, JR.

Norfolk. December 5, 1969. — January 7, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & QUIRICO, JJ.

*Evidence,* Opinion: expert; Impairment of earning capacity. *Damages,* Impairment of earning capacity.

At the trial of an action for personal injuries sustained in an automobile accident, it was error requiring a new trial to allow an actuary to indicate a substantial amount as damages for the weekly diminution of the plaintiff's earning capacity in answer to a hypothetical question which was not based on diminution of earning power from his principal employments but was based on an asserted loss caused by his inability to handle minor, secondary jobs the termination of which was not shown to have been caused by the accident. ·

TORT. Writ in the Superior Court dated November 9, 1964.

The action was tried before *Hale,* J.

*Thomas D. Burns (Stephen N. Subrin* with him) for the defendant.

*Monto Rosenthal* for the plaintiff.

WILKINS, C.J. This is an action of tort for personal injuries[1] incurred on March 13, 1964, in a collision of motor vehicles, one of which the plaintiff was operating. The jury returned a verdict of $82,500 for personal injuries, which the trial judge found to be excessive, and which was remitted to $42,500 by the plaintiff. There was evidence of the defendant's negligence.

The exceptions are to two rulings on evidence. The first is to the judge permitting an actuary to answer a hypothetical question which assumed that the plaintiff's earning capacity was reduced by $35 a week from 1966 to 2002. One Hurlbut, an actuary called by the plaintiff, testified on direct examination that the expectancy of life as of March 13,

---

[1] There was a verdict of $655 on a count for property damage, which is presently immaterial.

1964, of a white American male born on October 16, 1937 (as was the plaintiff according to some evidence) is 44.34 years.   The actual question which is the subject of exception was, "[W]ould you calculate . . . what sum of money invested at 4 per cent interest is sufficient to provide . . . a weekly amount of $35 . . . from February 1, 1966, until October 16, 2002, such sum to be exhausted at that time?" The answer was, "$36,000."

In order to test the propriety of the question and answer, it is necessary to attempt to state, at the risk of being tedious, a fair representation of the pertinent testimony.

On direct examination the plaintiff testified that he was working for Prudential Insurance Company in Boston when he was injured.   His work required a lot of physical activity.   "He was moving around all the time, setting up tapes, setting up forms . . . ."   Besides his work at Prudential, he had a newspaper agency in Stoughton for The Boston Herald.   His salary with Prudential was $5,700 and "he cleared $35 a week after automobile expenses for a newspaper route."   He used to get up about 5 A.M. to do his newspaper work.[1]   This took about an hour and a half and then he worked from 4:30 P.M. until 12:30 A.M. at Prudential. Then he would go home and sleep for a while and get up and do the newspapers.   When he was on the morning shift, he would work from 8:30 A.M. until 4:45 P.M.   One week he would be on the first shift and the second week he would be on the second shift from 4:30 P.M. to 12:30 A.M.   He described his injuries, which were largely to his back and legs and quite painful.   In May, 1964, two months after the accident, he entered a hospital, where a myelogram was performed.   "From March he tried to carry out the duties that he had other than at Prudential, the newspaper thing, but he just couldn't handle it."   From March until he went into the hospital a sixteen year old boy helped with the paper route.   "As far as his work with the Boston Herald, he had this boy working for him and he hoped his recovery was

---

[1] We infer that this was the Herald.

soon so that he would be able to assume full responsibility for it himself. His wife tried to help, but she could not handle it." On October 5, 1965, he went to work for Inland Express as a truck driver. When he went to work he was getting $3.15 an hour. In October and November he was a part time truck driver; and in December he was on a full time seniority list. After a year and a half, in August, 1967, he gave that up. He used to work nights for Inland Express. He went in at 7 P.M. and the shift ended at 4 A.M. and he would go and deliver the Globe after he finished work. If he did not go to work, he would have to get up at 5 o'clock in the morning to "do them." "At the end of the day he was all used up." He left Inland in August, 1967. He gave up the Herald when he went to work for Inland Express. For a while he had both the Globe and the Herald. He continued with the Globe after he went with Inland. His income from the Globe until he went to work for Inland was $30 a week plus the profits he made on the newspaper which went into the expense of the automobile. He gave up the Globe in the spring of 1967. After he left Inland he went to work at Nisbet Trucking Company, of which his brother is president, for $125 a week, his duties being largely office work.

On cross-examination the plaintiff testified: "After the accident he made deliveries himself." When he could not get the boy "to do them and there was nobody else to do them, they had to be done so he did them." He received more money in 1964 from the Herald than he had in 1963. "He testified on deposition[1] that he did not continue the route after the accident and was averaging $35 a week from the Herald Traveler . . . . When he testified in his deposition that between the day of the accident and October, 1965, he delivered no newspapers, that was not a fact . . . . He began delivering papers on a regular basis near the end of October, 1965." "He took on the agency of another newspaper before he went to work for Inland Express, and that

---

[1] We assume that this was taken before trial.

was the Boston Globe." He was working in May, 1967, place unspecified, and he earned $142 a week.

On redirect examination he testified that "he gave up the Boston Herald in the first week of 1966."

It is a familiar rule that the plaintiff in a personal injury action is entitled to recover damages for impairment of earning capacity. *Mahoney* v. *Boston Elev. Ry.* 221 Mass. 116, 117. *Chelsea Moving & Trucking Co. Inc.* v. *Ross Towboat Co.* 280 Mass. 282, 285. *Doherty* v. *Ruiz,* 302 Mass. 145, 146. The judge charged the jury to this effect without exception. But there remains the substantial issue whether the facts assumed in the hypothetical question fairly represent evidence. *Brown* v. *United States Fid. & Guar. Co.* 336 Mass. 609, 613–614. The answer given to the question, $36,000, is a substantial amount. This was the only testimony as to a sum for loss of earning capacity.

The defendant argues that there was no evidence that the plaintiff's earning capacity was diminished by $35 weekly from February 1, 1966, until October 16, 2002, a period of more than thirty-six years. We agree that evidence was lacking to support a loss of $35 weekly as a consequence of the accident.

Testimony as to the plaintiff's physical pain and inability to perform heavy work does not supply evidence of such loss. The only reference to a weekly amount as damages for lost earning capacity made in the argument in the plaintiff's brief is that he cleared $35 a week "on the newspaper route." This is a concentration on the secondary job for the Herald and a complete ignoring of the plaintiff's principal employment carrying the $5,700 salary with Prudential. The Herald agency was not given up until January, 1966, which may explain the date February 1, 1966, in the hypothetical question. In the meantime the plaintiff had taken on the Globe agency from which his income was $30 a week. For a while he had both agencies. He received more from the Herald in 1964 than in 1963. He retained the Globe agency until the spring of 1967. At the time of the trial (December, 1967) a doctor testified that he did not think

that the plaintiff was capable of lifting a bundle of newspapers, or that "he will ever handle a job that requires lifting, a lot of bending." The plaintiff himself testified that when he worked for Inland and held the Globe agency he was "all used up" at the end of the day.

We do not multiply references to the amount of the plaintiff's earnings in his various principal employments. It is sufficient that the plaintiff's alleged diminution of earning power is not claimed to embrace his principal employments but is based on an asserted loss caused by inability to handle secondary jobs which are minor and the termination of none of which is shown to have been caused by the accident.

It was error to permit the hypothetical question to be answered.

We need not consider the other exception. It is unlikely that the matter would arise in the same form at another trial.

*Exceptions sustained.*