LOUIS GOLDSTEIN *vs.* THEODORE GONTARZ & another.

Suffolk.    November 7, 1973. — March 20, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Negligence,* Motor vehicle, Contributory. *Practice, Civil,* Charge to jury; Conduct of trial; Exceptions: whether error harmful. *Error,* Whether error harmful. *Workmen's Compensation Act,* Action against third person. *Words,* "Extreme care."

In an action of tort, evidence of the circumstances in which the plaintiff was injured as he was standing in a warehouse docking bay and directing the defendant, a truck driver backing a fifty-foot tractor-trailer into the bay, did not require a ruling of law that the plaintiff was contributorily negligent. [804]

In an action for personal injuries allegedly arising from negligence of the defendant in backing a fifty-foot tractor-trailer into a docking bay of a warehouse, there was no reversible error where the judge in his charge, after correctly stating the single standard of due care, repeatedly used the words "extreme care" in discussing backing of vehicles. [805-807]

In a negligence action, permitting the plaintiff, in the opening statement of his counsel and again in his testimony, to interject the fact that he had elected not to receive workmen's compensation benefits and had not received money from his employer for his expenses was prejudicial error which was not cured by any instructions to the jury. [807-814] TAURO, C.J., dissenting.

No abuse of discretion was shown at the trial of a negligence action in permitting the plaintiff's counsel during his closing argument to use a blackboard indicating the plaintiff's damages in tabular form, even though the blackboard remained in place while the judge delivered his charge. [814-815]

At the trial of a negligence action there was no error in the judge's reading to the jury the portion of the writ setting out a large ad damnum where the judge instructed the jury that the figure was "arbitrary" and that it "did not mean much with respect to damages." [815-816]

TORT. Writ in the Superior Court dated August 31, 1970.

The action was tried before *Kelleher,* J., a judge of the District Court sitting under statutory authority.

*Daniel A. Lynch* for the defendants.

*J. Newton Esdaile* for the plaintiff.

KAPLAN, J.    In this action for personal injuries in which the plaintiff Louis Goldstein recovered verdicts against the defendants, Yale Transport Corporation and its agent Theodore Gontarz, we hold that the judge did not err in denying the defendants' motions for directed verdicts, but that the judgments cannot stand because the plaintiff put irrelevant and prejudicial matter before the jury and the judge failed to take corrective action. We also discuss other points that may arise on a new trial.

We state the facts of the accident as they could appear to the jury. The plaintiff was employed as a foreman by J. Shore & Company, Incorporated, a wholesaler of nails and burlap products. He was in charge of the warehouse activity including the loading and unloading of trucks through docking bays. At the time of the accident on March 10, 1969, he was fifty-two years of age, had worked for J. Shore since 1945, and was earning about $200 a week. .

March 10 was a fair, cold day. Six to eight inches of snow from two snowstorms lay in the warehouse yard. The truck traffic had packed the snow and made it somewhat icy. When work started in the morning, a J. Shore truck was at bay 3 and the plaintiff helped to load it. After that truck moved out of the bay, a truck of the defendant Yale Transport Corporation was backed in by the defendant Gontarz, unassisted.

The Yale truck consisted of a diesel tractor about twelve to fifteen feet long and a forty-foot trailer whose body was about eight feet wide and eight feet high and stood about four and one-half to five feet from the ground. The tractor had adjustable rear view mirrors on both sides of the cab giving a view to the sides and rear of the trailer. Forward the tractor had two wheels and in the rear two dual wheels; the

trailer had four rear wheels. Each wheel was air-braked and a single brake pedal, three inches from the accelerator, controlled all the brakes. The tractor weighed five tons and was hauling a load of nearly twenty tons of nails and bailing wire.

Bay 3 was approximately four feet above the ground. From ten feet in front of the bay the yard pitched eight inches up to the dock. The open bay was eight feet wide and eight or nine feet high, thus nearly matching the width and height of the body of the Yale trailer. On each side of the dockboard, within an inch of the end of the bay, a steel faced rubber bumper had been fastened, about eight inches wide and sixteen inches long, protruding about four inches from the face of the building. The building surfaces surrounding the bay were of concrete and brick. A spring held docking plate, six feet square with a sixteen inch protruding lip, formed part of the inside flooring of the bay. When a vehicle was backed to the bay, the operator would raise the docking plate with a hand lever, draw out the lip with another lever, and then lower the lip onto the back of the vehicle, walking on it or driving a fork lift over it to insure a firm flooring for loading and unloading purposes.

Resuming with the events of March 10: The Yale truck having been backed, the plaintiff, from inside the bay, lowered the lip of the docking plate over and onto the trailer, and proceeded to unload it by means of a fork lift running back and forth between the warehouse and the trailer over the docking plate and its lip. As pallets of nails were removed, the end of the trailer gradually rose, pushing up the lip of the docking plate and thereby shortening the overhang on the trailer and breaking up the flooring for the movement of the forklift. When about three-quarters of the nails had been removed, the plaintiff told the defendant Gontarz that the back edge of the trailer was getting too close to the end of the lip and instructed Gontarz to pull the truck out ten or fifteen feet and readjust.

Gontarz drove the truck out but it became stuck in the snow, so Gontarz and the plaintiff with two other J. Shore

employees set about removing snow and ice from the rear wheels of the tractor and the trailer. The plaintiff then told Gontarz to wait and he would go into the shop and direct him back to the bay. Gontarz said okay and the plaintiff went through the office building to the warehouse bay and stood at the front of the left hand end of the platform (as one looked out into the warehouse yard) with one foot on the cement and the other on the docking plate. The plaintiff took up this position before Gontarz reëntered the tractor. Gontarz rocked the truck back and forth a few times, then started the truck slowly backwards, with the plaintiff signalling to Gontarz, whom he could not see, with a sweeping motion of his left hand, the arm extended against the side of the building. When the trailer had come within a few feet of the platform, the plaintiff signalled with his left hand to stop. The truck stopped. The plaintiff then signalled with the sweeping motion again, and the truck started slowly back, coming, slightly at an angle, within a few inches of the bumpers. The plaintiff again signalled to stop, and the truck stopped two inches from the bumpers. The plaintiff looked down to make sure that the trailer was in a position to receive the lip of the docking plate. There was a roar of the truck motor and, before the plaintiff had a chance to withdraw his left arm, the truck lurched back over the left bumper, ramming the corner and wall left of the bay platform. The plaintiff's arm was caught between the truck and the corner. The arm was severely and permanently injured.

On his part, Gontarz testified that there was no arrangement for the plaintiff to direct him into the bay, that he performed the backing operation unassisted, looking in the right hand mirror, not the left, and that he had no sight of the plaintiff and knew nothing of any signalling by him. Two police officers, however, testified to a conversation with Gontarz after the accident from which it would appear that Gontarz was taking directions from the plaintiff; and the plaintiff testified that Gontarz admitted to him at the hospital that his foot had slipped off the brake and onto the accelerator.

1. The defendants claim error in the denial of their motions for directed verdicts, insisting not that Gontarz was free of negligence, but that the judge should have found the plaintiff to have been contributorily negligent as matter of law. The burden of establishing that the plaintiff was contributorily negligent was on the defendants. G. L. c. 231, § 85 (prior to amendments by St. 1969, c. 761, and St. 1973, c. 1123). It is only in a "rare" case in an exceptional situation that it can be ruled as matter of law that a proponent has met this burden. *Halley* v. *Hugh Nawn, Inc.* 356 Mass. 28, 30 (1969). *Joyce* v. *New York, N. H. and H. R.R.* 301 Mass. 361, 363 (1938). We do not think this is such a case. It is argued that the action of the plaintiff in extending his arm against the wall while directing a truck driver in a cab fifty feet away, whom he could not see, amounted to utterly heedless conduct. But on the evidence the jury could find that it was agreed the plaintiff would give directions as to the movement of the truck, that in pursuance of the understanding directions were given and followed nearly to the end, that the arrangement was not foolhardy, and its execution on the plaintiff's part not indifferent to his own safety. Moreover, "[a]lthough it was the duty of the plaintiff to exercise the care of a reasonably prudent person under all the circumstances, he could rely to some extent on the assumption that the driver of the truck would exercise some care to avoid hitting him." *Dube* v. *Keogh Storage Co.* 236 Mass. 488, 492 (1920). See *Falzone* v. *Burgoyne,* 317 Mass. 493, 497 (1945); *Holden* v. *Bloom,* 314 Mass. 309, 313 (1943). In the circumstances we cannot say that the plaintiff's lowering his eyes to the platform for a moment, after the truck had stopped inches from the dock, shows conclusively a lack of care. *Ferrairs* v. *Hewes,* 301 Mass. 116, 119 (1938). *Runnells* v. *Cassidy,* 307 Mass. 128, 130 (1940). And considering how sudden was the backward lurch of the truck, any fault of the plaintiff could be found to have contributed nothing to the injury. Cf. *Neylon* v. *Phillips,* 179 Mass. 334, 336 (1901).[1]

---

[1] Unlike the present case, authorities relied on by the defendants involve situations in which plaintiffs deliberately chose to ignore obvious dangers, took no precautions

2. The defendants now accept that Gontarz's negligence was a question for the jury, but they contend that the judge instructed erroneously on that matter.

The judge charged, first, in conventional style, that "[n]egligence is the failure to exercise that degree of care, diligence and safety that an ordinarily prudent person would exercise under similar circumstances." After touching on several other points, the judge returned to the subject, and in amplification said that the "backing of a vehicle" is an "operation of a vehicle which should only be undertaken with extreme care." The judge then quoted language from *Minsk* v. *Pitaro,* 284 Mass. 109, 112 (1933).[2] He said further: "It entails a limitation of the driver's view when you're backing up; and it's something to be undertaken only with extreme care and diligence on the part of the operator." Twice more the words "extreme care" were repeated in this passage of the charge. The defendants objected and excepted to all but the initial statement by the judge.

The charge was not exemplary, but we believe it passes muster. In deciding whether there was negligence, the trier is to ask how a person of ordinary prudence would act in the circumstances. This is the sole standard. *Kane* v. *Fields Corner Grille, Inc.* 341 Mass. 640, 641-643 (1961). Restatement 2d: Torts, § 298 (1965). Prosser, Torts (4th ed.) § 34, p. 181 (1971). To be sure, the amount of care that the prudent person would exercise varies with the circumstances, the care increasing with the likelihood and severity of the harm threatened, *Adams* v. *Dunton,* 284 Mass. 63, 66-67 (1933); *Clough* v. *New England Tel. & Tel. Co.* 342 Mass. 31, 35

---

to protect themselves, and had no reasonable expectation of protection from others, *Neylon* v. *Phillips,* 179 Mass. 334 (1901); *O'Neill* v. *Middlesex & Boston St. Ry.* 244 Mass. 510 (1923); *O'Neill* v. *W. T. Grant Co.* 335 Mass. 234 (1957); *Barry* v. *Stop & Shop, Inc.* 335 Mass. 767 (1957); *Weir* v. *New York, N. H. & H. R.R.* 340 Mass. 66 (1959), or situations in which the plaintiffs' actions were those of a person who "grope[s] in the dark," *Hiltberg* v. *Truex,* 344 Mass. 414, 419 (1962), or leaps without looking, *Gambardello* v. *H. J. Seiler Co.* 335 Mass. 49 (1956); *Gidge* v. *Security Realty Co.* 347 Mass. 779 (1964).

[2]"The backing of a vehicle entails more or less limitation on the view by the driver of the area to be traversed and thus requires corresponding vigilance on his part to avoid causing injury to persons who are known to be, or likely to be, there, whether the vehicle is being backed on a public street or on private land."

(1961); *Gelinas* v. *New England Power Co.* 359 Mass. 119, 124 (1971); Restatement 2d, *supra,* § 298, comment b (1965), but that is not to deny that the standard is single.

With respect to certain combinations of recurrent circumstances, it is fair to say that the human reagent will always behave with heightened — i.e., more than usual — care, and when one of these situations appears in a lawsuit, the trial judge may acknowledge the fact in his instructions. Restatement 2d, *supra,* § 285, comment e (1965).[3] There are few situations of that sort, see *Kane* v. *Fields Corner Grille, Inc., supra,* at 642,[4] but when one occurs, the judge must consider studiously how to communicate to the jury that more than usual care was called for. Catchphrases like "highest degree of care" or "extreme care" are perhaps not happily chosen, because the words suggest to jurors some fixed, though not quite expressible, maximal level of care, rather than a level tied and responsive to the risk involved in the particular factual setup.[5] The court therefore said in the *Kane* case that "the better practice is to refer only to reasonable care with appropriate reference to the circumstances." 341 Mass. at 643.[6]

The backing of a vehicle is not among the few situations

---

[3]Comment e states in part: "The standard with which the actor's conduct is to be compared may be more or less precisely defined by a decision or series of decisions of an appellate court. Certain situations, or combinations of situations, recur with such frequency that it is possible to find a fairly definite expression of judicial opinion as to the manner in which persons who find themselves therein should conduct themselves."

[4]Common carriers have often been charged with such duties because they exercise complete control of the instrumentality, and the consequences of a lack of care may be drastic. *Bannister* v. *Berkshire St. Ry.* 301 Mass. 598, 600 (1938). *Carson* v. *Boston Elev. Ry.* 309 Mass. 32 (1941). *Bloom* v. *Town Taxi, Inc.* 336 Mass. 78 (1957).

[5]The possible ambiguity is reduced when the judge uses the phrase in close relation to his statement of the conventional negligence standard which associates the amount of care required with the nature of the risk. In this respect the *Kane* charge (see below in the text) was rather better than the present charge.

[6]This view harmonizes with *Mounsey* v. *Ellard,* 363 Mass. 693 (1973), where we held that occupier's liability should not be made to turn on the characterization of the plaintiff as a licensee or invitee, but rather should depend on the total configuration of the facts.

See the carefully framed charge suggested in *Ambrose* v. *Cyphers,* 29 N. J. 138, 149-150 (1959) (Weintraub, C. J.).

which invariably demand heightened or "extreme" care on the part of the man of ordinary prudence. The *Minsk* case, cited by the judge, does not so categorize the backing of a vehicle, nor does any one of the many cases dealing with this operation that have been decided by this court over the years.[7] Rather the cases indicate that the amount of care required depends upon the specific setting. Thus in a technical view the judge's charge in the present case was defective. The defect in the charge can be excused, however, because the circumstances here — a fifty-foot tractor-trailer being backed into bay 3 under the described conditions — happened in fact to call for heightened (or, to indulge a dubious word, "extreme") care. A similar point came up in the *Kane* case. A customer at a tavern sued the owner for injuries caused by an assault by another customer which, it was claimed, the bartender should have foreseen and prevented. The judge's charge, stating that the business of a tavern keeper called for the "highest degree of care" in prevention of violence, though wrong in principle, did not constitute reversible error because the proved circumstances actually demanded heightened care. The form of statement was not in substance misleading when applied to the specific facts. Nor was it in the present case.

3. In his opening remarks to the jury, the plaintiff's counsel said: "Now, Mr. Goldstein will tell that at the time he was working for J. Shore and was injured, that he could have taken his Workmen's Compensation rights, but he didn't do that. He has taken no rights of any kind. He has elected to take whatever rights he's got against Yale and the defendant Gontarz. He will tell you he has taken no rights, no money for hospitalization, no money from his employers. He's elected to take whatever rights he's got against these defendants we are suing now." When the plaintiff's counsel

---

[7]See n. 3 above. The court has spoken of "a degree of care commensurate with the probable harmful consequences," *Thomas* v. *Spinney,* 310 Mass. 749, 751 (1942), but the usual reference has been to "reasonable caution," *Wilgoren* v. *Pelton,* 266 Mass. 17, 18 (1929), or "ordinary care," e.g., *Dowd* v. *Tighe,* 209 Mass. 464, 466 (1911); *Smith* v. *Whittall,* 257 Mass. 306, 308 (1926); *Walker* v. *Bullard,* 317 Mass. 288, 290 (1944).

concluded his opening speech, the defendants filed a motion for a mistrial on the ground of prejudice, but the motion was denied, with exception. In the course of the trial, when the plaintiff was called as a witness in his own behalf, he was allowed to testify under questioning by his counsel, and over defendants' objections and exceptions: Q. "Did you ever take Workmen's Compensation?" A. "No, sir." Q. "Have you ever received a penny from the Workmen's Compensation carrier [of] J. Shore?" A. "No, sir." Q. "Have any of your medical or hospital bills been paid by J. Shore, your employer, or any compensation carrier of his?" A. "No, sir." The judge in his charge to the jury remarked that counsel's statements in their openings were not evidence and that the jury should not be swayed by sympathy, but the judge's only words that made any approach to the actual subject of the quoted opening and testimony were: "It doesn't make any difference whether he [the plaintiff] has had some source of money on which to live since his injury. A negligent defendant would have no right to ask you to diminish the plaintiff's damages for that reason, since the defendant didn't supply it."

Although we have never ruled on a case where the fact of nonreceipt of, or election against, workmen's compensation was interjected in a negligence action, the implication of the settled law here and elsewhere is that it is prejudicial unless in some way palliated. First, a plaintiff ordinarily may not show that the defendant is insured against liability. *Braun* v. *Bell,* 247 Mass. 437, 442-443 (1924). *Gladney* v. *Holland Furnace Co.* 336 Mass. 366, 368 (1957). Prosser, Torts (4th ed.) § 83, p. 549 (1971). Exposing juries to such information is condemned because it is not itself probative of any relevant proposition and is taken to lead to undeserved verdicts for plaintiffs and exaggerated awards which jurors will readily load on faceless insurance companies supposedly paid for taking the risk. Wigmore, Evidence (3d ed.) § 282a (1940). Second — a counterpart proposition — a defendant may not show that the plaintiff has received other compensation for his injury, whether from an accident insurance policy, *Gray*

v. *Boston Elev. Ry.* 215 Mass. 143, 146 (1913), from workmen's compensation, *Benson* v. *Guyette,* 350 Mass. 759 (1965); *West* v. *Molders Foundry Co. Inc.* 342 Mass. 8, 9 (1961); annotation, 77 A. L. R. 2d 1154 (1961), from an employer, *Shea* v. *Rettie,* 287 Mass. 454, 458 (1934), or from other sources, *Tipton* v. *Socony Mobil Oil Co. Inc.* 375 U.S. 34 (1963); *Eichel* v. *New York Cent. R.R.* 375 U. S. 253 (1963); *Helfend* v. *Southern Cal. Rapid Transit Dist.* 2 Cal. 3d 1 (1970). Again the information is irrelevant where, by reason of the so called "collateral-source rule," the receipts from the outside source do not go to reduce the defendant's liability; yet jurors might be led by the irrelevancy to consider plaintiffs' claims unimportant or trivial or to refuse plaintiffs' verdicts or reduce them, believing that otherwise there would be unjust double recovery. See Schwartz, The Collateral-Source Rule, 41 B. U. L. Rev. 348 (1961); 1969 Ann. Surv. of Mass. Law, § 2.7. Third, a defendant is not permitted to assert or imply that he is not protected by insurance; especially is this proscribed when there has been no improper suggestion of insurance by the opposing party. Such statements are considered tantamount to a plea of poverty, not only irrelevant but prejudicial in that they might influence jurors toward giving defendants compassionate but strictly unmerited relief from personal liability. *Piechuck* v. *Magusiak,* 82 N. H. 429 (1926). *King* v. *Starr,* 43 Wash. 2d 115, 119-121 (1953). *Socony Vacuum Oil Co.* v. *Marvin,* 313 Mich. 528, 538-540 (1946). McCormick, Evidence (2d ed.) § 201, pp. 481-482 (1972). Appleman, Insurance Law and Practice, § 12838 (1962). Annotation, 4 A. L. R. 2d 761 (1949). Fourth — here we approach the present situation, a counterpart of the third — a plaintiff is forbidden to show that he has no resort to insurance or workmen's compensation to cover the loss he has suffered. In the few cases where plaintiffs have forced the issue, courts have indicated that this evidence should be rejected on like grounds of irrelevance and prejudice, the prejudice running here against defendants. *Snyder* v. *Lehigh Valley R.R.* 245 F. 2d 112, 116 (3d Cir. 1957). *Lee* v. *Osmundson,* 206 Minn. 487 (1939).

*Bridgeforth* v. *Proffitt,* 490 S. W. 2d 416, 425-426 (Ct. App. Mo. 1973). Jones, Evidence (6th ed.) § 4.48 (1972). Summing up, the courts have sought to repel reference to or evidence of the parties' resources for bearing losses or footing liabilities, and have exhorted juries simply to find the facts, including damages, impartially, without wondering or speculating about extraneous supposed equities. See *Hoffman* v. *Brandt,* 65 Cal. 2d 549 (1966).

It may be argued that the third and fourth classes of cases differ from the others in that there is no covert encouragement of the jury to disregard the law, rather there is emphasis upon the controlling law: thus, to tell the jury that the plaintiff has not received a workmen's compensation award is — so it may be contended — merely to underline or reinforce the collateral-source rule by establishing that in fact there was no collateral payment, as the jury might otherwise have imagined. But the customary prophylactic statement of the collateral-source rule by a judge and his exclusion of evidence in accordance with it are not the same thing as deliberate proof by a party of an immaterial proposition freighted with innuendo and left without explanation. See *Piechuck* v. *Magusiak, supra,* 82 N. H. at 431 (1926). But see Falknor, Evidence, 29 N. Y. U. L. Rev. 953, 976-977 (1954). It is, moreover, important to observe that the message that the plaintiff's counsel here conveyed to the jury was not merely that the plaintiff had not received workmen's compensation but that he had elected against it — a message implying supreme confidence on the plaintiff's side in his cause of action, but far from disclosing the true nature or meaning of the election.[8]

---

[8]Under G. L. c. 152, § 15 (as in effect at the date of the accident), the plaintiff could have taken his workmen's compensation award without relinquishing the common law claim against the defendants as tortfeasors. If the insurer pursued that claim and succeeded, it would reimburse itself out of the avails of the action for its payment to the plaintiff and pay four-fifths of any balance to him; if the insurer failed to pursue the claim, the plaintiff could do so, reimbursing the insurer and retaining the entire balance for himself. The insurer and the plaintiff would share the expense of any attorney's fee as they might agree, but if the insurer brought the action the plaintiff could not be required to bear an expense disproportionate to his recovery. See *West* v. *Molders Foundry Co. Inc.* 342 Mass. 8, 9 (1961); *Chaves* v. *Weeks,* 242 Mass. 156, 158 (1922).

Why the plaintiff rejected workmen's compensation in the present case was left to conjecture.

Goldstein *v.* Gontarz.

Had a strong, even-handed explanation and clarification of the workmen's compensation problem been forthcoming from the judge, the situation might have been saved, as in some other cases of prejudicial disclosures during counsel's opening or during trial.[9] But here the judge's charge was not curative. The caution that counsel's statements are not evidence was insufficient because the objectionable information was also introduced on the direct examination of the plaintiff. And the reference to the collateral-source rule, in the cryptic and unelaborated form in which it was made, might even have led the jury to believe that they should add what the plaintiff might have received under workmen's compensation to the damages otherwise assessed. Surely the instructions given were not that "rigorous and emphatic action on the part of the judge" required in similar predicaments by our past decisions. *London* v. *Bay State St. Ry.* 231 Mass. 480, 486 (1919). *Commonwealth* v. *Crehan,* 345 Mass. 609, 613-615 (1963). Cf. *Shea* v. *D. & N. Motor Transp. Co.* 316 Mass. 553, 554-555 (1944); *Salter* v. *Leventhal,* 337 Mass. 679, 698 (1958); *Luz* v. *Stop & Shop, Inc. of Peabody,* 348 Mass. 198, 207-208 (1964). Nor do we think the defendants were required to apply for a corrective instruction after the judge had twice ruled flatly against them. *Doherty* v. *Levine,* 278 Mass. 418, 420 (1932). *Heina* v. *Broadway Fruit Mkt. Inc.* 304 Mass. 608, 611 (1939). *Commonwealth* v. *Smith,* 342 Mass. 180, 185-186 (1961).

Attendant factors also speak against the plaintiff in the present case.[10] The reference to workmen's compensation was not even inferentially probative of a relevant proposition.[11] It was not responsive to any tendentious remark by the defence, and was introduced not by inadvertence but

[9]See, e.g., *Dempsey* v. *Goldstein Bros. Amusement Co.* 231 Mass. 461, 465 (1919); *Shea* v. *D. & N. Motor Transp. Co.* 316 Mass. 553, 554-555 (1944); *Salter* v. *Leventhal,* 337 Mass. 679, 697-698 (1958); *Luz* v. *Stop & Shop, Inc. of Peabody,* 348 Mass. 198, 207-208 (1964); *Fialkow* v. *DeVoe Motors, Inc.* 359 Mass. 569, 571-572 (1971).

[10]For listings of factors that may be relevant in determining the prejudicial effect of mention of insurance or lack of insurance, see 29 Am. Jur. 2d, Evidence, § 407 (1967), and Appleman, Insurance Law and Practice, § 12834 (1962).

[11]See, at n. 13 below, discussion of use of the fact of insurance coverage or the like for a proper probative purpose.

deliberately. See *Kennedy* v. *Armstrong,* 223 Mass. 354, 358 (1916); *Trout* v. *Talerico,* 237 Iowa 285, 293-294 (1946); *Stehouwer* v. *Lewis,* 249 Mich. 76, 82 (1929); *Ostrowski* v. *Mockridge,* 242 Minn. 265, 270 (1954); *Bridgeforth* v. *Proffitt, supra,* 490 S. W. 2d at 425-426 (Ct. App. Mo. 1973). Competent counsel would be conscious, in the light of the condition of the authorities, of the manifest risk of error. Still no approach was made to the judge alone for an advance ruling, rather he was presented with an accomplished fact. Not only was the point made at the opening; it was rubbed in by testimony of the plaintiff himself, with the judge lending his approval by overruling a specific objection to it. See *Heina* v. *Broadway Fruit Mkt. Inc., supra,* 304 Mass. at 611 (1939); *Murray* v. *Foster,* 343 Mass. 655, 660 (1962). Cf. *Snyder* v. *Lehigh Valley R.R., supra,* 245 F. 2d at 116 (3d Cir. 1957). As indicated in our point 2, above, the charge on negligence bore strongly on the defendants. At least on the issue of contributory negligence, the evidence in the case was close. And the verdict appears large.[12] Cf. *Snowhite* v. *State, Use of Tennant,* 243 Md. 291, 305 (1966). On the whole case, we feel obliged, regretfully, to say that there was error beyond the harmless, requiring a new trial.

We are aware that the rules against introduction of matters of insurance coverage or the like have come under attack. Critics point out that, except as they guard against more or less explicit appeals to juries based simply on the presence or absence of coverage, the rules are not very effective in keeping the subject away from the triers. See McCormick, Evidence (2d ed.) § 201, p. 481 (1972); Wigmore, Evidence (3d ed.) § 282a, pp. 134-137 (1940). It is not possible to set up secure bulkheads against hints about insurance, especially as some information concerning it may be admissible as probative of a relevant proposition, say "control" or credibility of a particular witness.[13] When the information is thus rele-

[12]The verdicts were each in the amount of $350,000. Compare the blackboard figures mentioned below.

[13]See, e.g., *Perkins* v. *Rice,* 187 Mass. 28, 30 (1904); *Dempsey* v. *Goldstein Bros. Amusement Co.* 231 Mass. 461, 464 (1919); *Marsh* v. *Beraldi,* 260 Mass. 225, 232 (1927). Insurance may also enter a case inadvertently through the nonresponsive

vant, it may still be excluded on the ground that its prejudicial effect outweighs its probative value, but such judgments are delicate and may invite appeal. Again, even when the trial record is barren of any mention of the censored subjects, they may insinuate themselves into the case through casual assumptions by the jurors, for example, assumptions about the prevalence of liability insurance or the availability of workmen's compensation. Kalven, The Jury, the Law, and the Personal Injury Damage Award, 19 Ohio St. L. J. 158, 171 (1958). Wigmore, *supra,* at 146. It is sometimes said that jurors are so prone to assume that workmen's compensation has been received for industrial accidents that a plaintiff who has not in fact received an award should be entitled to have that information given to the jurors in order to right the balance in their minds. See McCormick, *supra,* at 481-482. Cf. 1950 Ann. Surv. of Am. Law, 809, n. 13. On similar reasoning, if it be true that jurors assume that defendants generally carry liability insurance, then they should be told when a given defendant is not in fact covered. Cf. 29 Am. Jur. 2d, Evidence, § 405 (1967). In this view, even the amounts of the awards or the dollar limits of the liability insurance might also be candidates for disclosure. See *Wilbur* v. *Tourangeau,* 116 Vt. 199, 203 (1950). But what jurors assume, we can only guess; nor do we know what follows from the assumptions: on the assumption that liability insurance is widespread, are jurors today indifferent to the size of verdicts against insurers, or do they rather consider the effect of verdicts on the insurance rates which they will themselves have to pay? In a welter of unverified assumptions as to what jurors are likely to assume or to think in varying situations, it is understandable that courts have simply done what they could in the way of excluding irrelevant evidence, and have relied on general cautionary instructions.

reply of a naive witness, e.g., *Ostrowski* v. *Mockridge,* 242 Minn. 265 (1954), or because it is inextricably bound up with other relevant evidence, such as an admission, e.g., *Mazzuchelli* v. *Silberberg,* 29 N. J. 15, 26 (1959). In *McDonald* v. *Alamo Motor Lines,* 222 S. W. 2d 1013 (Tex. Civ. App. 1949), an insurance proof of loss form completed by the plaintiff was admitted to impeach the plaintiff's claim of impairment of writing ability.

What emerges from consideration of the decisions and the critical writing is that attention to a procedure for advance deliberation may prove helpful. When it appears that the question of the mention of coverage will arise in a serious way, counsel where feasible should consult beforehand with the judge as to how the matter should be handled. Such discussions may well take place at pre-trial conference, soon to be encouraged by Rule 16 of the new Rules of Civil Procedure to go into effect on July 1, 1974. See *Mazzuchelli* v. *Silberberg,* 29 N. J. 15, 26 (1959); Wigmore, *supra,* § 282a. In many cases, minimizing or excluding reference to the subject during trial, and neutralizing any effect on the jury by a proper charge, will be a sound course. In some cases the better course may be to have the facts as to coverage frankly disclosed to the jury, again with appropriate commentary. Preferably the disclosure, as well as the commentary, should be by the judge. Unannounced unilateral forays by counsel in the course of trial, as in the present case, are perilous and should be avoided. We welcome careful, cooperative efforts by counsel and trial judges on the lines described.

4. During his closing argument the plaintiff's counsel used a blackboard which remained in place while the judge delivered his charge. Set up in tabular form were:$27,358 in medical bills; $33,000 loss of wages at $200 a week from the time of the accident to time of trial; $150,000 loss of future earnings at roughly the same rate, assuming a period of fifteen years (or $100,000, assuming ten years) — life expectancy being shown as nineteen years. The total was $210,358 (or $160,358) damages. The precise grounds of the defendants' objections to the blackboard are not clearly shown in the record, but the following comments are in order.

Permission to use a blackboard as a graphic aid is discretionary with the trial judge and abuse of discretion is not shown. *Everson* v. *Casualty Co. of Am.* 208 Mass. 214, 219-220 (1911). *Hamilton* v. *Heath,* 246 Mass. 335 (1923). *Commonwealth* v. *St. John,* 261 Mass. 510, 520 (1928). Cf. *Farrell* v. *Matchett,* 310 Mass. 87 (1941). See generally Leach and Liacos, Handbook of Massachusetts Evidence, 290-291

(1967). It is said to be the better practice to remove the blackboard at the close of counsel's argument so that the jury may concentrate on the judge's charge, *Haycock* v. *Christie,* 249 F. 2d 501 (D. C. Cir. 1957); *Cross* v. *Robert E. Lamb, Inc.* 60 N. J. Super. 53, 76 (1960); annotation, 86 A. L. R. 2d 239 (1962), but a fetish need not be made of this; it is a matter of discretion for the trial judge.

Was there an adequate evidentiary basis for the figures displayed — especially the $200 rate assuming total disability (and without discount of the figures to present value) — or was there a distortion of the evidence going beyond those exaggerations acceptable as the expression of a moderate partisan zeal? See *Doherty* v. *Ruiz,* 302 Mass. 145, 146-148 (1939); *Gardner* v. *State Taxi, Inc.* 336 Mass. 28, 30 (1957); *Kane* v. *Fields Corner Grille, Inc., supra,* 341 Mass. at 643-646 (1961); *Nisbet* v. *Medaglia,* 356 Mass. 580, 583-584 (1970). We are unable to judge of this because the whole of counsel's closing argument does not appear of record. Even if, standing alone, the blackboard demonstration went impermissibly afield, it may have been corrected and confined by other remarks of counsel not before us.

5. The defendants contend that the judge "charge[d] with respect to matters of fact" in violation of G. L. c. 231, § 81,[14] in the sense of putting undue stress on evidence favorable to the plaintiff and skimping evidence on the defendants' side. We do not find that the judge's attention was squarely directed to the points now objected to, see *Sawyer* v. *Worcester Consol. St. Ry.* 231 Mass. 215, 219 (1918); *Mansell* v. *Larsen,* 311 Mass. 607, 612-613 (1942), but in all events the contention is not borne out by a review of the charge in the light of so much of the evidence as is embodied in the bill of exceptions.

Objection was taken to the judge's reading the portion of the writ setting out an ad damnum of $1,000,000. The judge said that the figure was "arbitrary"; that "[i]t does not mean much with respect to damages, if you so find damages

---

[14]General Laws (Ter. Ed.) c. 231, § 81, provides: "The courts shall not charge juries with respect to matters of fact, but they may state the testimony and the law."

in this case." Although we find no error, more emphatic language could well have been used to dismiss the ad damnum as being wholly without significance in the finding of a proper verdict. Cf. *Luz* v. *Stop & Shop, Inc. of Peabody, supra,* 348 Mass. at 207 (1964).[15]

*Exceptions sustained.*


TAURO, C.J. (dissenting).    I dissent from the majority opinion for the following reasons.

The defendants' rather simplistic argument is to the effect that if the plaintiff had received workmen's compensation, evidence of this would have been inadmissible as irrelevant. Therefore, the defendants contend, evidence that the plaintiff did not receive workmen's compensation was also irrelevant and its admission was so prejudicial to the defendants as to require a new trial.

Even assuming that the disputed evidence was irrelevant, it is difficult to rationalize how its admission was so prejudicial as to constitute reversible error unless it can be argued that the defendants were entitled to have the jury speculate rather than to have the facts about this phase of the case. I believe the existence of workmen's compensation is a matter of common knowledge in all such actions. When the jury are left in the dark as to whether the plaintiff has or has not received workmen's compensation, it is likely that at least some of the jurors would contend, in mitigation of damages, that the plaintiff had been compensated for a substantial portion of his loss of earnings and for his medical bills. Other jurors

[15]"In this Commonwealth from time immemorial, in opening, the pleadings have been read to the jury. Howe's Practice (1834) 252. Colby's Practice (1848) 238. At the close of a trial, the writ and declaration and answers in their final form customarily go to the jury." *Woodworth* v. *Fuller,* 235 Mass. 443, 446 (1920). Although including the ad damnum in the writ may be necessary for various procedural purposes, there seems to be little justification, besides history, for disclosing the ad damnum to the jury. It does not in fact limit the amount of recovery and may be increased by amendment even after verdict. See *Ellis* v. *Ridgway,* 1 Allen 501 (1861); *Luddington* v. *Goodnow,* 168 Mass. 223, 225 (1897); *Kinnear* v. *General Mills, Inc.* 308 Mass. 344, 346-347 (1941). We agree with recent suggestions that in most cases where the damages are unliquidated and rest with the jury, the trial judge would be better advised to withhold the ad damnum from the jury than to read the figure and then attempt to negate its effect with an instruction. See Hennessey, Procedure and Evidence — Suggestions for Change, 50 Mass. L.Q. 329, 332-333 (1965).

could argue that the action was really a fight between two insurance companies — one the workmen's compensation carrier to recoup its payments to the plaintiff and the other the insurance company covering the motor vehicle. It is conceivable, of course, that the jury might scrupulously follow the instructions of the judge and give no consideration to anything except the evidence submitted to them in open court.

The majority tend to the latter proposition. In my opinion the sounder view is one which avoids the "ostrich head in the sand" approach but, instead, permits the jury, in arriving at a verdict, to know the truth, namely, that the plaintiff received no workmen's compensation. I cannot perceive how this could improperly add one iota to the jury's verdict. I respectfully submit that the majority opinion has opted for the path which invites speculation and conjecture on the part of the jury in arriving at a verdict and I must note my disagreement.

The majority opinion notes that the "verdict appears large" leaving the possible inference that it would have been less if the jury had not been aware that the plaintiff had not collected workmen's compensation. If this is the inference intended its logic escapes me. Moreover, the amount awarded for the total and permanent loss of the use of one arm, resulting in almost total disability as to future employment and very substantial medical bills, together with pain and suffering, does not appear to be unreasonable or excessive.

The majority opinion points out that the plaintiff could have accepted workmen's compensation and still retained his right of action against the defendants if the workmen's compensation insurance carrier did not initiate the action within the statutory period. This requires a discussion of some of the practical aspects of the situation. Had the plaintiff collected workmen's compensation his negligence claim against the defendants, if exercised by the compensation carrier, would have been in the exclusive control of the latter. It is understandable that a plaintiff, especially with injuries as serious as those in the instant case, would prefer to control his own litigation rather than leave it in the hands of an in-

surance carrier whose primary interest would be to recoup its expenses.[1] The mere fact that a settlement in such cases must be approved by the Industrial Accident Board or by a judge of the court does not give the plaintiff the same feeling of security and protection that he has when the control of the litigation, whether in settlement or trial, is essentially his.

A further point is urged by the majority opinion; namely, that the plaintiff's election in some way unduly influenced the jury in thinking that the plaintiff had an overabundance of confidence as to the righteousness of his claim against the defendants. Again, the logic and rationale of this contention elude me. Admittedly, the plaintiff in electing to proceed against the defendants, rather than initially collecting his workmen's compensation, took the risk of losing everything if he failed to prevail against the defendants.

I think a more logical conclusion is that the plaintiff had carefully weighed the possibilities and probabilities and decided that it was in his best interest economically to proceed against the person who caused his injuries.

---

[1] Where there is a close case on liability such as the instant case, there could be a serious conflict between the interests of the injured plaintiff (employee) and those of the workmen's compensation carrier. Having paid a very substantial sum of money to the employee by way of medical bills and compensation and in order to protect its own interests, the compensation insurance carrier could make out a strong case (especially where the liability of the third-party defendant is questionable) for a settlement of the case against the tortfeasor for substantially less than its potential value. In such circumstances, it would be reasonable for the Industrial Accident Board or a Superior Court judge to approve the settlement. Here it should be noted that the lawyer who brings the action on behalf of the employee represents him in name only. His real client is the compensation insurance carrier.

On the other hand, if the employee waives compensation and proceeds on his own against the third-party defendant, he has complete control of the case from its very inception. He can adjust the case or try it to a conclusion according to what he believes to be his own best interests.

As to an election by the employee between a claim for compensation and a personal injury action against a third-party defendant, see extensive revision of § 15 of G. L. c. 152, by St. 1971, c. 888, applicable to injuries occurring after January 12, 1972. The employee from that date on is entitled, *without election,* to the compensation and other benefits provided by the Workmen's Compensation Act. The employee can maintain complete control over the right to initiate the third-party action by bringing the action at law before he claims or accepts compensation. The insurer has no right to initiate a third-party action unless the employee has filed a claim for compensation or has accepted compensation *"under an agreement."* This legislative history further underpins the rationale of permitting the jury to know, in the interests of fairness and justice, of the employee's election not to accept workmen's compensation in cases where injuries occurred prior to January 12, 1972.

It is a risk that most plaintiffs take when they opt for a jury trial after refusing what they consider an unsatisfactory settlement. A jury verdict should not be vacated absent a prejudicial error or a possible miscarriage of justice. I perceive neither in this case. In my view the injustice lies in depriving the plaintiff of his verdicts for no valid reason and compelling him to undergo the delay and expense of another long trial.