Garsh, J.
The plaintiff Maria Natal (“Natal”) brought this action as the administratrix of the estate of her father, Carlos Adorno (“Adorno”), who was shot to death on February 11, 1996 by New Bedford Police Officer Henry Turgeon, III (“Turgeon”) during an investigation into illegal sale of alcohol to minors. Natal’s complaint, which was commenced in the United States District Court for the District of Massachusetts, asserts claims for a violation of 42 U.S.C. §1983, wrongful death pursuant to G.L.c. 223, §2, and negligence under the Tort Claims Act, G.L.c. 258. On February 24, 1999, the District Court (Young, J.) entered summary judgment in favor of the defendants on Natal’s federal civil rights claims and remanded the state law claims to this court. Thereafter, the parties stipulated to the dismissal with prejudice of the claims still pending against the individual defendants.
This matter is before the court on the motion for summary judgment filed by the City of New Bedford ("the City”) pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the City’s motion for summary judgment on Counts III and IV of the Second Amended Complaint is allowed.
BACKGROUND
The undisputed facts contained in the summary judgment record are as follows.
Henry Turgeon is a New Bedford Police Officer. On February 11, 1996, at approximately 10:00 p.m., Turgeon, while on routine patrol in the North End section of the City, was engaged in conversation with New Bedford Police Officer Gus Santos (“Santos”), when they observed two young men walking down the street carrying a case of beer. Turgeon approached the youths, inquired where they had obtained beer on a Sunday, and asked them for identification. The youths stated that they had purchased the beer from a man living on Beetle Street known as “the Bootlegger.” They offered to show Turgeon where the Bootlegger lived. Turgeon drove them to Beetle Street, where they pointed out Adorno’s house. One of the youths saw Adorno in the window and pointed him out.
Turgeon returned to where Santos was waiting. While Turgeon was looking at Adorno’s house, Santos had been joined by New Bedford Police Officer Shain Ramos (“Ramos”). The three officers discussed making an undercover buy from Adorno and decided that Ramos would go to the Beetle Street address and attempt to purchase beer. Turgeon advised the New Bedford Police Department dispatcher that he would be out of contact on a disturbance call. Ramos donned a black jacket over his uniform shirt and a baseball cap. He then took five marked one-dollar bills and went to Adorno’s house. Turgeon radioed the New Bedford Police Department dispatcher that he, Ramos and Santos would be off the air.
Ramos entered the Beetle Street building, went to the second floor apartment and rang the buzzer. When Adorno answered the door, Ramos handed him the five marked bills and stated that he wanted five beers. Adorno took the money and walked off into the apartment. At all times, the door was fastened to the door casing with a thick metal chain. Ramos removed his black jacket and baseball cap, exposing his uniform, badge and police insignias. As Adorno returned toward the door holding a brown paper bag, Ramos stated, “Police, open the door!” and repeated this command continuously in a loud voice. Adorno turned away and walked out of sight.
At approximately this time, Turgeon arrived at the scene, and Ramos informed him that Adorno had re-entered the interior of the apartment. Turgeon leaned over to look inside the apartment through the partially opened but chained door and observed Adorno holding a shotgun. Adorno was fidgeting with the gun, moving his hands up and down near the trigger mechanism. Ramos yelled repeatedly to Adorno, “Drop the gun!” and Turgeon began to force the door open by kicking it. Neither Ramos nor Turgeon could see what Adorno was doing with the shotgun. Because the chamber of the shotgun was closed, there was no way visually to determine whether there was a round in the chamber. Turgeon concluded that it would be unsafe for he and Ramos to retreat because a bullet from the shotgun could travel through the door before stopping and because of the small size of the landing on which they were standing and the lack of cover. Accordingly, Turgeon decided to force the door down and apprehend the armed suspect.
As he kicked the door open, Turgeon observed Adorno, drew his service weapon and fired one shot, *454 striking Adorno in the right abdomen. Turgeon claims that he saw Adorno leveling the shotgun at the two officers; the report of Chief Medical Examiner states that the trajectory of the bullet is consistent with Adorno’s turning toward his left, away from the officers, at the time he was shot. Less than one minute elapsed between the time Turgeon first observed that Adorno had a gun and the time Turgeon fired the fatal shot. Adorno fell to a sitting position against the couch with the shotgun lying on his lap. Turgeon secured the shotgun and called the paramedics, while Ramos used a towel to apply pressure to Adorno’s wound. Adorno later died of the wound to his abdomen.
The New Bedford Police Department has a Planning and Training Division (“DPS”) which is responsible for in-service training for the Police Department. Every new police officer is on probation for a period of one year during which the officer undergoes a monthly fitness review. Each officer is issued a General Orders manual and a Policies and Procedures manual which are continuously updated. As of February 11, 1996, the use of firearms by New Bedford Police Officers was governed by General Order 94-56, which states in relevant part:
In determining when to use force, officers are to be guided by the principle that the least amount of force reasonably necessary in any situation is the greatest amount of force that is permissible. Any use of force must be justified. Only that amount of force which is reasonable shall be used to overcome resistance directed against the officer or to effect the safety of another . . .
A police officer is authorized to use a firearm in the following circumstances if there is no other reasonable alternative:
a. To defend himself or another person from unlawful attack when he has reasonable cause to believe there is imminent danger of death or great bodily injury.
The New Bedford Police Department subscribes to a service offered by the International Association of Chiefs of Police known as the "Training Keys.” Each Training Key addresses a particular- training topic. Under this program, a monthly training bulletin was disseminated to every officer at roll call, and every officer was expected to read and understand each Training Key.
Prior to February 11, 1996, Turgeon had never fired his weapon at any suspect, and the New Bedford Police Department had never received any .complaints about Turgeon or any incidents of improper discharge of a firearm by Turgeon. Both Turgeon and Ramos attended the Massachusetts Training Council Police Academy for seventeen weeks as a prerequisite to joining the New Bedford Police Department. The Police Academy curriculum included firearms training. Every year, both officers were required to attend in-house training, which includes training in the use of firearms and a requirement that each officer qualify in the use of firearms. This yearly training includes instruction in the use of deadly force. Further, officers are encouraged to attend other training classes, camps, and seminars, and they are given paid days off to do so. In September of 1995, Turgeon and Ramos attended a class at the Woodcock Pond training site which included target and threat recognition. In October of 1995, Turgeon and Ramos attended a forty-hour training camp at Camp Edwards which largely concerned the use of firearms.
Turgeon and Ramos were both members of the New Bedford Police Department Special Reaction Team (“SRT”) and were required to attend SRT training twice every month. SRT training includes “threat/no-threat shooting,” a live shooting exercise which teaches officers to react quickly to different, potentially dangerous and volatile situations and make a quick determination of the degree of danger confronting them. SRT officers are trained to “de-escalate” potentially violent situations if possible.
DISCUSSION
The City contends that it is entitled to judgment as a matter of law on Counts III and IV of the Second Amended Complaint because the District Court’s grant of summary judgment in Natal v. City of New Bedford, 37 F.Sup.2d 74 (D.Mass. 1999), on the federal civil rights claims precludes Natal from relitigating the issue of whether Turgeon’s use of deadly force against Adorno was reasonable. Counts I and II of the Second Amended Complaint alleged that Turgeon’s shooting of Adorno while attempting to arrest him constituted an excessive use of force in violation of the Fourth Amendment. The District Court applied the following standard in analyzing whether Turgeon’s use of deadly force was unconstitutional:
The “reasonableness” of Turgeon’s use of deadly force “must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.”. . . The reasonableness question is an objective one; that is, the Court must consider whether Turgeon’s actions were “objectively reasonable” in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation . . . Moreover, [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.
Natal v. City of New Bedford, 37 F.Sup.2d at 76 (citations omitted). The District Court held that “(v]iewing Turgeon’s actions without the benefit of hindsight, his actions were objectively reasonable.” Id.
Under the doctrine of collateral estoppel, or issue preclusion, when an issue of fact or law is actually litigated and determined by a final judgment, and the *455 determination is essential to that judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. Treglia v. MacDonald, 430 Mass. 237, 240 (1999); Fireside Motors, Inc. v. Nissan Motor Corp., 395 Mass. 366, 372 (1985). The purpose of collateral estoppel is to conserve judicial resources, to prevent the unnecessary costs associated with multiple litigation, and to ensure the finality of judgments. Treglia, 430 Mass. at 240. The guiding principle in determining whether to allow a party to use collateral estoppel is whether the party against whom it is asserted had a full and fair opportunity to litigate the issue sought to be precluded. Id. at 241.
As the party asserting collateral estoppel, the City bears the burden of showing that all prerequisites to its application exist and, in particular, that there is a common issue in the prior and present proceedings. See Carrasquillo v. Commonwealth, 422 Mass. 1014, 1015 (1996); Fireside Motors, Inc., 395 Mass. at 373. The entry of summary judgment in the District Court on Natal’s federal civil rights claims constituted a final judgment on the merits which may be given preclusive effect between the parties.[2] See Wright Machine Corp. v. Seaman-Andwall Corp., 364 Mass. 683, 693 (1974) (stating that a summary judgment has preclusive effect where it is based on a determination that there is no genuine dispute of material fact and one party is entitled to judgment as a matter of law). Moreover, the finding that Turgeon’s use of deadly force against Adorno was reasonable under the circumstances was necessary to the District Court’s determination that Natal could not prevail on her claim that the defendants had violated the Fourth Amendment. See Natal, 37 F.Sup.2d at 76-77. Nonetheless, in order for collateral estoppel to apply, the City also must demonstrate that the issues in the prior adjudication and those at the heart of Natal’s state law claims are in, in effect, the same. Carrasquillo, 422 Mass. at 1015; Fireside Motors, Inc., 395 Mass. at 373. Even if there is a lack of total identity between the issues involved in two adjudications, the overlap may be so substantial that preclusion is plainly appropriate. Commissioner of the Department of Employment and Training v. Dugan, 428 Mass. 138, 143 (1998).
Count III of the Second Amended Complaint asserts a wrongful death claim under G.L.c. 223, §2 and alleges that Turgeon’s use of deadly force on February 11, 1996 was negligent, wilful and reckless. Under Massachusetts law, the classic definition of negligence is “the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances.” Beaver v. Costin, 352 Mass. 624, 626 (1967). Stated succinctly, negligence is the failure to exercise that degree of care which a reasonable person would exercise under like circumstances. Gilhooley v. Star Market Co., 400 Mass. 205, 207 (1987); Goldstein v. Gontarz, 364 Mass. 800, 804 (1974); Morgan v. Lalumiere, 22 Mass.App.Ct. 262, 267, rev. den., 398 Mass. 1103 (1986). In determining whether conduct is negligent toward another, the fact that the actor is confronted with a sudden emergency which requires rapid decision is a factor in determining the reasonable character of his choice of action. The question remains whether the defendant acted as a reasonable person would under similar emergency circumstances. Newman v. Redstone, 354 Mass. 379, 383 (1968). Negligence is thus judged by an objective standard. See Meyer v. Wagner, 429 Mass. 410, 424 (1999) (discussing attorney malpractice). A subjective good faith exercise of judgment or an honest belief will not protect a person from an otherwise negligent act or omission. Id. See also W. Page Keeton, Prosser & Keeton, On the Law of Torts §32, at 173-74 (5th ed. 1984) (the reasonable person standard of conduct in negligence cases is an objective one which, at the same time, makes allowance for the risk apparent to the actor).
In order to prevail on her wrongful death claim, Natal must prove, by a preponderance of the evidence, that in using deadly force against Adorno, Turgeon failed to exercise that degree of care which a reasonable police officer would have exercised under like circumstances. Whether Turgeon acted with reasonable care is precisely the issue resolved by the District Court when it concluded that, viewed from the perspective of a reasonable officer on the scene, in light of the facts and circumstances confronting him and without the benefit of hindsight, Turgeon’s conduct was objectively reasonable. Natal v. City of New Bedford, 37 F.Sup.2d at 76. Natal’s argument that her federal civil rights claim in the District Court is a different cause of action from her state wrongful death claim misses the point, as the doctrine of collateral estoppel makes a determination of fact conclusive in a subsequent proceeding between the parties, whether on the same or a different claim. See Treglia, 430 Mass. at 240.[3] That the District Court reached its conclusion that Turgeon’s conduct was reasonable in the context of a Fourth Amendment claim and Natal wishes now to pursue the matter as a wrongful death claim under state law does not detract from the reality that the factual inquiry and standard of proof in both claims is identical. Compare Krochta v. Commonwealth, 429 Mass. 711, 716 (1999) (refusing to apply collateral estoppel despite a common factual issue because the standard of proof in the two proceedings was different).
Natal had both the incentive and the opportunity to litigate fully the reasonableness of Turgeon’s conduct during the District Court summary judgment proceeding, and the plaintiff has identified no special circumstances which justify affording her an opportunity to *456 relitigate that issue. Compare Tuper v. North Adams Ambulance Service, Inc., 428 Mass. 132, 136 (1998) (declining to give preclusive effect in a wrongful termination action to an agency decision where the agency proceedings were informal and the employer lacked the incentive to fully litigate the issues in that forum). Natal had her day in court on the question of the reasonableness of Turgeon's use of force against Adorno and thus is foreclosed from litigating that issue again. See Almeida v. Travelers Ins. Co., 383 Mass. 226, 231 (1981) (giving preclusive effect to the Board of Appeal on Motor Vehicle Liability Policies and Bonds’ determination that a driver was not more than 50% at fault for an accident in an action against the driver’s insurance company for coverage for the accident); Maher v. General Motors Corp., 370 Mass. 231, 234 (1976) (giving preclusive effect to a jury verdict that the operator of a motor vehicle negligently caused an accident in the operator’s later suit against the motor vehicle manufacturer). Because Natal is bound by the finding in the District Court that Turgeon’s use of deadly force against Adorno was reasonable under the circumstances, she has no reasonable expectation of prevailing on her wrongful death claim under G.L.c. 223, §2, which alleges that Turgeon’s use of deadly force on February 11, 1996 was negligent, wilful and reckless. See Sigman v. Town of Chapel Hill, 161 F.3d 782, 789 (4th Cir. 1998) (concluding that where police officers were entitled to qualified immunity with respect to alleged Fourth Amendment violations because their use of force was objectively reasonable, the officers’ conduct could not be found to be negligent or otherwise wrongful for purposes of a state wrongful death action); Franklin v. City of Pontiac, 887 F.Sup. 978, 983 (E.D.Mich. 1995) (concluding that a state court’s grant of summary judgment to police officers on an arrestee’s state law claim alleging use of excessive force had collateral estoppel effect in the arrestee’s subsequent federal court action alleging a violation of the Fourth Amendment as the issues in each case were identical); Clark v. Department of Correctional Services, 564 F.Sup. 787, 788-89 (S.D.N.Y. 1983) (concluding that a state court’s dismissal of a prisoner’s claim against a correctional department alleging negligence in allowing correctional officers to use excessive force involved the same issue for collateral estoppel purposes as that presented in suit in federal court alleging violations of 42 U.S.C. §1983, but declining to give the state court dismissal collateral estoppel effect because the plaintiff had proceeded pro se in that action and did not have a full and fair opportunity to litigate it); City of Anderson v. Davis, 743 N.E.2d 359, 366 (Ind.App.Ct. 2001) (concluding that a federal court’s grant of summary judgment against a plaintiff in his civil rights claim alleging use of excessive force had collateral estoppel effect in the plaintiffs state court claim for negligence, precluding the plaintiff from arguing that the city was not entitled to immunity under the Indiana Tort Claims Act because it had used excessive force); Estate of Fennell v. Stephenson, 528 S.E.2d 911, 916-17 (N.C.App.), rev. granted, 545 S.E.2d 224 (N.C. 2000) (concluding that estate’s state law wrongful death claim was barred by the collateral estoppel effect of the federal court’s summary judgment ruling that the police officer, who shot and killed plaintiffs decedent, was entitled to qualified immunity on claim of Fourth Amendment violation because the issue was the same; whether the officer’s use of deadly force was objectively reasonable under the circumstances). The City is therefore entitled to judgment as a matter of law on Count III of the Second Amended Complaint.
The City further argues that it is entitled to judgment as a matter of law on Count IV of the Second Amended Complaint, which asserts a claim under the Massachusetts Tort Claims Act, G.L.c. 258. A claim against a public employer under Chapter 258 is governed by the same common law principles of liability that apply to private parties. Dinsky v. Framingham, 386 Mass. 801, 804 (1982). Thus, to the extent that Count IV seeks to hold the City vicariously liable for Turgeon’s negligence, the District Court finding that Turgeon’s use of deadly force against Adorno was reasonable precludes such a claim.
In addition, the City moves for judgment as a matter of law on Count IV on the ground that the present summary judgment record fails to raise a genuine issue of material fact with respect to whether the City negligently trained its police officers in the use of force and the de-escalation of potentially violent situations. In order to defeat a well-pleaded motion for summary judgment, the plaintiff must show, through admissible evidence, the existence of a dispute of material fact. Quigley v. Bay State Graphics, Inc., 427 Mass. 455, 459 (1998). The use of hearsay is prohibited in an opposition to a motion for summary judgment. See Mass.R.Civ.P. 56(e). The purpose of excluding hearsay is to avoid a trial that will be futile due to the lack of competent evidence. Mitchell v. TAC Technical Services, Inc., 50 Mass.App.Ct. 90, 91-92 n. 3 (2000).
Natal conceded at oral argument that the sole support in the summary judgment record for her claim of negligent training is a report dated May 30, 1997 entitled, “The Plan for Renewal: A Plan of Action for the New Bedford Police Department” (“the Plan”).[4] In 1997, the City’s mayor contracted with First Security, Inc. (“First Security”), a private organization, to conduct a four-month study of the New Bedford Police Department and assess the Department’s strengths and weaknesses. First Security set forth its findings and recommendations to the mayor in the Plan. The Plan is offered by Natal for the truth of the statements contained therein, and thus constitutes hearsay which cannot be considered for purposes of this summary judgment motion unless it falls within some recognized hearsay exception.
*457 Natal argues that the Plan is admissible as a business record under G.L.c. 233, §78, which provides in relevant part:
An entiy in an account kept in a book ... or a writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall not be inadmissible in any civil.. . proceeding as evidence of the facts stated therein because it is transcribed or because it is hearsay or self-serving, if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil . . . proceeding aforesaid and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter.
A document cannot be admitted into evidence as a business record unless all four statutory prerequisites to admissibility are established. DiMarzo v. American Mutual Ins. Co., 389 Mass. 85, 105 (1983); NationsBanc Mortgage Corp. v. Eisenhauer, 49 Mass.App.Ct. 727, 733 (2000). The Plan fails as a business record under G.L.c. 233, §78 because it is undisputed that it was prepared as a special, onetime evaluation and it therefore was not made in the regular course of the New Bedford Police Department’s business. The Plan also fails to qualify under the statute because the writer clearly relied upon information from other persons, and it was not shown that those persons had reported that information as business routine. See Irwin v. Ware, 392 Mass. 745, 749 (1984).
Further, even if the Plan could be deemed a business record under G.L.c. 233, §78, the statutory hearsay exception does not extend to entries which constitute the opinions of the preparer of the record; opinions in a business record are admissible only if they fall into some other exception to the hearsay rule. Id. (concluding that a medical examiner’s letter containing his expert opinion was not admissible as a business record); Burke v. Memorial Hospital, 29 Mass.App.Ct. 948, 949 (1990) (concluding that personnel records consisting almost entirely of judgmental evaluations and opinions were not admissible as business records); Wilk v. Rathore, 21 Mass.App.Ct. 399, 402 (1986) (concluding that a record of surgery which contained a doctor’s opinion of the cause of the patient’s injury was not admissible as a business record). Compare Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 18-19 (1998) (concluding that a pharmaceutical company’s scientific studies were admissible as business records where they contained primarily factual data and no specific objection had been made to those portions of the studies containing the author’s interpretations and conclusions). The portions of the Plan relied upon by Natal in support of her negligent training claim are either First Security’s opinions and conclusions concerning the shortcomings of the New Bedford Police Department,[5] or summaries of the hearsay statements of unidentified members of the public or Police Department.[6] Thus even if some portions of the Plan are admissible as a business record, those portions which Natal relies upon to create a disputed question of fact on a material issue are not admissible under G.L.c. 233, §78.
The Plan also is not admissible under the common law hearsay exception for official or public records, which allows the admission of a record of a primary fact made by a public officer in the performance of official duty. See Julian v. Randazzo, 380 Mass. 391, 393 (1980); Herson v. New Boston Garden Corp., 40 Mass.App.Ct. 779, 793, rev. den., 423 Mass. 1108 (1996). The Plan was not prepared by a public officer or employee acting within the scope of his duty, but rather by First Security, Inc., a private corporation. That the report was requested by the mayor and funded by the taxpayers does not transform it into a public record. See Kelly v. O’Neil, 1 Mass.App.Ct. at 319 (concluding that an accident report prepared by a citizen and required to be filed with the local police department was not admissible as a public record). See also Ricciuti v. New York City Transit Authority, 754 F.Sup. 980, 985 (S.D.N.Y. 1990), vacated on other grounds, 941 F.2d 119 (2d Cir. 1991) (concluding that a study of the N.Y. Transit Authority commissioned by the government in response to widespread public concern of wrongdoing was not admissible as a public record under Fed.R.Evid. 803(8) where it was carried out by a private company).
Moreover, it is well established that “records of investigations and inquiries conducted, either voluntarily or pursuant to requirement of law, by public officers concerning causes and effects involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are not admissible in evidence as public records.” Julian v. Randazzo, 380 Mass. at 393 (concluding that an internal investigative report of a police officer’s discharge of his weapon was not admissible as either a business record or a public record where it contained the author’s opinion that the officer’s use of his weapon was justified); Herson v. New Boston Garden Corp., 40 Mass.App.Ct. at 793 (holding that the admission of OSHA citations plainly implicates the prohibition against expressions of opinion and conclusions). The statements in the Plan relied upon by Natal to show negligent training are not primary facts, but rather are inadmissible conclusions and opinions. Cf. Ariza v. City of New York, 139 F.3d 132, 134 (2d Cir. 1998) (concluding that a report by a police department’s Internal Affairs Bureau was not admissible as a public record under Fed.R.Evid. 803(8) where it contained a summary of the beliefs and attitudes of a group of police officers and did not contain factual findings).
*458 Once the inadmissible hearsay is eliminated from the record, there is nothing which raises a genuine issue of material fact with respect to the claim of negligent training. The City has satisfied its burden of demonstrating that proof of an essential element of the plaintiffs case is unlikely to be forthcoming at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The City is therefore entitled to judgment as a matter of law on Count IV of the Second Amended Complaint to the extent that count seeks to hold the City liable for negligent training.
Finally, even assuming that the summary judgment record raised a material issue of fact with respect to whether the City was negligent in its training of police officers, the District Court finding that Turgeon’s use of deadly force against Adorno was reasonable precludes recovery on a theory of negligent training. The mere existence of a breach of duty does not create municipal liability; rather, there must be proof of proximate cause. See Jean W. v. Commonwealth, 414 Mass. 496, 511 (1993). Causation is an essential element of a negligence action, and the plaintiff must adduce proof of a causal connection between the defendant’s conduct and the plaintiffs injury, either by direct evidence or rational inferences of probabilities from established facts. Glidden v. Maglio, 430 Mass. 694, 696 (2000); Borden v. Betty Gibson Associates, Inc., 31 Mass.App.Ct. 51, 54 (1991). Because Turgeon’s use of deadly force on February 11, 1996 has conclusively been determined to have been reasonable under the circumstances, any negligence by the City in training its police officers in the use of force cannot rationally be deemed to have brought about Adorno’s death. Whether or not Turgeon was well-trained, he acted reasonably. Accordingly, the City is entitled to judgment as a matter of law on Count IV of the Second Amended Complaint.[7]
ORDER
For the foregoing reasons, it is hereby ORDERED that the City of New Bedford’s motion for summary judgment on Counts III and IV of the Second Amended Complaint be ALLOWED.

 Natal chose not to appeal the grant of summary judgment by the District Court.

 There is no merit to Natal’s argument that had the District Court intended its finding of reasonableness to be binding with respect to the state law claims, it would have entered summary judgment on those claims as well. The District Court decision makes clear that the court dismissed the pendent state law claims for lack of jurisdiction following the grant of summary judgment on the federal claims. See Natal v. City of New Bedford, 37 F.Sup.2d at 84. Thus, the District Court never considered the merits of Natal’s state law claims.

 Natal’s expert did not opine that Turgeon’s training was inadequate, but only that Turgeon failed to act in accordance with recognized police standards.

 For example. Natal cites page 4 of the report which opines. “Most officers do not have the verbal and tactical skills necessary for de-escalating a potentially violent encounter.”

 For example. Natal cites page 72 of the report which states, “Many officers, nevertheless, feel ill equipped for dealing with the public. The survey found that almost all, 97.8%, say that training in conflict resolution is only fair, poor, or not available. Over half, 57.9%, agree that most officers lacked the verbal and tactical skills necessary for de-escalating a potentially violent encounter.”

 It is unnecessary to address the City’s final argument that, although the claims seek recovery for negligent action, the City is nevertheless immune from liability under G.L.c. 258, §10(c) because Natal’s claims arise out of an intentional tort, there being no doubt that Turgeon intended to shoot Adorno.